Joseph W. DROWN, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 1253–59.

United States District Court
S. D. California,
Central Division.

Jan. 30, 1962.

Witter & Harpole, Los Angeles, Cal., for plaintiffs.

Laughlin E. Waters, U. S. Atty., Edward R. McHale, Asst. U. S. Atty., Chief, Tax Division, Robert H. Wyshak, Asst. U. S. Atty., for the United States.

CROCKER, District Judge.

This is an action by Joseph W. Drown for the refund of an alleged overpayment of Federal income tax for the year 1948. The suit is brought under § 7422 of the Internal Revenue Code of 1954, 26 U.S.C. § 7422, following the denial of plaintiff's claim for refund by R. A. Riddell, District Director of Internal Revenue. Jurisdiction is based on § 1346(a) (1) of the Judicial Code, Title 28 U.S.C. The plaintiff was represented by Myron E. Harpole, Esq., and the defendant was represented by Francis C. Whelan, United States Attorney, Robert H. Wyshak, Esq., Assistant United States Attorney, appearing.

Plaintiff alleges that the additional tax for 1948 was due to the erroneous disallowance by the Collector of Internal Revenue of (1) a partial business bad debt deduction against plaintiff's 1948 gross income in the amount of $50,000, and (2) $28,515.54 ordinary and necessary expenses paid during 1948 in carrying on plaintiff's business as a deduction against his 1948 gross income.

The facts giving rise to plaintiff's first contention are: Design Associates, Inc. (hereinafter referred to as "Design") was incoporated on May 22, 1946, with plaintiff and Don Loper as 50% stockholders in return for cash contributions of $7,500 each, of which Loper's contribution was derived from a loan to him by plaintiff. Loper was President, plaintiff was Vice-President, Charles Northrup was Treasurer, and G. Bentley Ryan was Secretary. Loper's contribution to the corporation was his talent in designing clothes and in interior decorating. Drown was to advance to Design sums of money to get the business started. The initial purpose of Design was to operate as a custom house, manufacturing and selling custom clothes. The corporation also intended to do motion picture set designing and to solicit interior decorating business.

On or about the dates shown below, plaintiff transferred funds to or for the account of Design which were recorded on the books of the corporation as loans payable:

| | |
|---|---|
| May 28, 1946 | $ 2,000 |
| May 31, 1946 | 20,000 |
| August 20, 1946 | 10,000 |
| September 4, 1946 | 10,000 |
| September 13, 1946 | 15,000 |
| September 17, 1946 | 10,000 |
| September 23, 1946 | 10,000 |
| September 26, 1946 | 20,000 |
| October 12, 1946 | 15,000 |
| October 24, 1946 | 5,000 |
| November 6, 1946 | 5,000 |
| November 9, 1946 | 10,000 |
| November 29, 1946 | 2,000 |
| March 27, 1947 | 4,000 |
| April 30, 1947 | 1,000 |
| Total | $139,000 |

The balance in said account on the books of Design on January 31, 1948, was $135,425.42. Notes totaling this amount were canceled on February 22, 1948, and a note for $85,425.42 was made. Drown took a $50,000 business bad debt deduction for the year 1948. Additional facts will be mentioned as they become pertinent to the legal issues.

The principal questions presented by these facts are two. First, whether loans made by taxpayer to a corporation of which he was an officer, director and 50% stockholder, are deductible in part as a business bad debt under § 23(k) (1), of the Internal Revenue Code of 1939, Title 26 U.S.C., § 23(k) (1), or whether these advancements are deductible only under 23(k) (4) as a non-business bad debt not incurred in the taxpayer's trade or business, and are thus to be taken into account as a short term capital loss. Second, whether taxpayer's cancellation in 1948 of $50,000 of a total indebtedness of $135,425.42 owing him from the corporation in 1948, constitutes a bad debt loss or amounts to a contribution to the corporation's capital.[1]

The Government contends that Drown was primarily engaged in the hotel business, managing, buying and selling them, and in investing in securities; that he was not in the business of promoting enterprises or loaning money; therefore the advancements to Design were not a part of his trade or business.

Testimony at the trial and statements of Drown's income, dating from 1940 to 1948, show that the plaintiff was engaged in numerous enterprises which were so varied that they logically included loans to Design as being a part of plaintiff's trade or business. They show that while most of Drown's income was derived from the management, purchase, reor-

ganization and sale of hotels, he engaged in many other business ventures: operation of the Cafe La Fayette and Shaeffer's, a tailor partnership; sale of stock in Rosslyn Fireproof Building Co. and in Hotel Securities Corp.; Van Drown Commissary and Supply Company, a partnership, engaged in feeding aircraft and shipyard employees; fees for settling a labor dispute; Mineral Exploration in California; "If Shoe Fits," a joint venture in a Broadway show; Toni Teller, shoe business; Garden Land Co., development and sale of residential land; George Eadley, Inc., a corporation engaged in the design and sale of jewelry; Harry Barron Co., manufacture and sale of fountain pens for hotel rooms; Loyola Foundation, interest income from trust deed.

Though the courts have not been in complete agreement with respect to what sort of activities on the part of the taxpayer are within the purview of his trade or business, they have agreed that such a determination depends on the facts of the particular case. See 25 A. L.R.2d pp. 633–652 for an excellent presentation of the cases.

Several cases have denied the taxpayer a business bad debt where he has loaned money to an enterprise and he has been involved in more than one business. The courts in these instances have generally relied on the fact that the taxpayer's business interests were too limited to in-

---

1. The relevant statute is Section 23, Internal Revenue Code of 1939, 26 U.S.C. § 23:

"§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions:

\* \* \* \*

"(k) [as amended by Sec. 124(a) of the Revenue Act of 1942, c. 619, 56 Stat. 798, and Sec. 113 of the Revenue Act of 1943, c. 63, 58 Stat. 21] Bad debts.

"(1) General rule. Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduc-

tion. \* \* \* This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection. \* \* \* "

"(4) Non-business debts. In the case of a taxpayer other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term 'non-business debt' means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."

clude the enterprise from which he was attempting to deduct the canceled debt.[2]

■ In order for a taxpayer who is involved in multiple enterprises to deduct a business bad debt relating to one of the enterprises it must be found that he is in the business of "dealing in enterprises." Giblin v. C. I. R., 227 F.2d 692, 695 (5th Cir. 1955). The taxpayer must convince the court that his promotional and lending activities are sufficiently continuous and extensive to constitute an occupation in and of itself. Rollins v. C. I. R., 32 T.C. 604, affirmed 276 F.2d 368 (4th Cir. 1960). Where the taxpayer is "constantly looking for opportunities for the use of his money and time * * *" and "those which he found were many and varied," it has been held that he sustained a business bad debt when he made loans to one of his businesses. Sage v. Commissioner, 15 T.C. 299 (1950).

■ The activities of Mr. Drown are sufficiently extensive to constitute a business which is separate from any one of the businesses in which he has an interest. He is regularly engaged in the business of "dealing in enterprises" during the course of which he operates either as a stockholder, proprietor, manager, lender or partner, or in a combination of these capacities, contributing to each enterprise such initiative, advice and financial backing as it required.

Counsel for the Government has cited several cases which have denied the taxpayer a business bad debt deduction. In Commissioner of Internal Revenue v. Smith, 203 F.2d 310 (2d Cir. 1953), cert. denied 346 U.S. 816, 74 S.Ct. 27, 98 L.Ed. 343, the taxpayer loaned money to a corporation operating a farm. Smith was the general manager and stockholder and worked on the farm on week ends and evenings. He was employed as the general manager of a department store and was also a shareholder in the store. He was a shareholder and director of three other companies. Smith took part in the management of a garage in which he and his brother were partners and loaned money to the enterprise. He also owned and managed a business building.

The Second Circuit, in holding that Smith was not entitled to a business bad debt from canceled loans to the farm corporation, said: " * * * since each of these activities separately does not constitute a business, we cannot see how a combination of them spread over various businesses can alter the result. Of course, if respondent were regularly engaged in lending money to business enterprises, bad debt losses resulting therefrom would be incurred in his business." From this statement it must be concluded that the Second Circuit did not think Smith was engaged in a sufficient number and variety of enterprises to classify him as being in the business of "dealing in enterprises." Otherwise a taxpayer who loaned money to one of his corporate enterprises would not be entitled to a business bad debt deduction

2. Ferguson v. C. I. R., 253 F.2d 403 (4th Cir. 1958). Taxpayer advertised himself as a private banker, made small loans to corporations and organized at least 25 corporations to conduct a variety of businesses. Most of these activities were prior to 1932. The instance in issue occurred in 1949. The court held that taxpayer was a promoter prior to 1930 but was not in this business when he tried to take the business bad debt.

Pokress v. C. I. R., 234 F.2d 146 (5th Cir. 1956). Taxpayer for 20 years was engaged in business as a broker in the purchase and sale of business properties. He frequently advanced his own funds in order to secure a sale. On one occasion taxpayer took stock in a restaurant in return for an advance of money to help consummate a sale which didn't go through. The restaurant did poorly and taxpayer advanced more money. Held: The latter transaction was not in his trade.

Skarda v. C. I. R., 250 F.2d 429 (10th Cir. 1957). Taxpayers were in a partnership which engaged in farming. The partnership expanded its operations into the cattle business and in one instance, real estate. Subsequently, they created a corporation to engage in the newspaper business. Held: The latter was not in their trade or business.

See cases cited by the Government, infra.

unless he were in the business of loaning money.

Commissioner of Internal Revenue v. Smith is distinguishable from the one at bar. Drown's business interests are greater in number and more diverse than those of Smith.

Counsel for the Government cited O'Neill v. C. I. R., 271 F.2d 44 (9th Cir. 1959), where the taxpayer had loaned considerable sums of money to a timber corporation which he had created. The corporation was dissolved in 1950, and in 1952 taxpayer claimed a bad debt loss on loans which he claimed he made to the corporation. O'Neill's tax returns revealed that his principal occupation was the practice of law. The court refused to allow O'Neill a business deduction, stating that he was not in the business of "loaning money" nor in the business of "promoting, financing and managing business enterprises." The O'Neill case is clearly not in point since O'Neill was not involved in multiple enterprises. Counsel for the Government cited Holtz v. C. I. R., 256 F.2d 865 (9th Cir. 1958), where the taxpayer's only businesses were (1) the sale and distribution of film and equipment, and (2) the sale of ladies' apparel, which businesses he chose to carry out through the medium of several corporations. The Ninth Circuit affirmed the Tax Court decision that the loans taxpayer had guaranteed for his corporation, which borrowed from the bank, could not be written off as business bad debts. The Circuit Court stated that petitioner had failed to recognize the distinction between "carrying on one's business through a corporate form * * *" and the "business of dealing in corporations * * *." It is this distinction which differentiates the case at bar from Holtz.

Also cited by the Government is Rollins v. C. I. R., supra. From 1918 to 1953 taxpayer was actively engaged as an insurance investigator and adjuster, and in the practice of law, which provided his largest source of income. During this period he also participated in 22 business ventures; two were in issue.

The first three ventures were "remote in years from subsequent activities, and, generally, too insignificant to contribute in the establishment of any pattern of business promotions." Seventeen remained to be analyzed. Eleven of these ventures related to one field, the trucking business. In denying taxpayer a business bad debt deduction, the court held that the other six ventures since 1935, which included the two in issue, did not alone or in conjunction with the trucking enterprise constitute a separate business of promoting, financing, managing and making loans to business ventures.

The Rollins case differs from the one at bar in that Drown's activities were of the number and degree that this court concludes that he had established himself, by 1948, as being in the business of seeking business opportunities, promoting, organizing and financing them, contributing such time and energy as they required and then disposing of them either at a profit or loss.

The Fourth Circuit, in the Rollins case, distinguished Giblin v. C. I. R., supra, cited by Rollins. Giblin, like Rollins, was an attorney with outside business interests. But Giblin engaged in a large variety of enterprises: organized an association to take control of the Everglades Drainage District; real estate subdivision; real estate business; leased a race track; formed the Biscayne Bonding Co. which wrote surety bonds; operated a dog track; operated a restaurant; invested in Saunders and Storm, Inc.; formed a corporation to provide laundry and dry cleaning service to members at a cut rate; engaged in the grain market. The court in the Giblin case allowed the taxpayer to take a business bad debt on cancelled loans to one of his enterprises.

The facts in the Giblin case are analogous to the one at bar. To hold that the loans to Design were not made in Drown's trade or business would indeed "apply a sterile and rigid approach that is not contemplated by the statute." Giblin v. Commissioner, supra.

Some cases have stated that a passive investor is not entitled to a business debt deduction, that only the taxpayers who associate themselves actively with the businesses in which they are interested deserve such treatment. Macy v. C. I. R., Tax Ct. Mem. 8/17/49. It should be noted that in the Giblin case, as in the one at bar, the plaintiff did not invest much time in the business in question. But it is clear from the facts that Drown lent such aid to Design " * * as he considered, in the exercise of his business judgment, would best accomplish that purpose." Giblin v. C. I. R., supra.

We now turn to the contentions of the Government that (1) the advances made by Drown to Design constitute capital investments rather than loans because of the inadequate capitalization of Design; (2) Drown knew the corporation was insolvent when he made the advances; therefore, they were capital contributions since the debts were worthless when created. Whether or not the advances made by Drown to Design created a debt or constituted capital contributions is a question of fact to be determined by the trier of facts. Matthiessen v. C. I. R., 194 F.2d 659 (2nd Cir. 1952). The court recognizes that transactions between a corporation and one of its major stockholders who is also an officer are subject to close scrutiny; that a bad debt deduction is a matter of legislative grace and the statutory provision granting it must be strictly construed; that the taxpayer has the burden of proving the bad debt deduction. With these principles in mind, the court has carefully examined the evidence. There is evidence pointing both ways, that is, that the advancements were in the nature of loans or were in the nature of a capital investment.

The Ninth Circuit holds that the intention of the parties is a major factor in determining whether advances by stockholders to a corporation are loans or capital investment. Maloney v. Spencer, 172 F.2d 638 (9th Cir. 1949); L. A. Shipbuilding & Drydock Corp. v. U. S., 289 F.2d 222 (9th Cir. 1961). This intention must be the objective intent disclosed by all the pertinent factors in the case and not just the formal manifestations of intent declared by the taxpayer. Maloney v. Spencer, supra; Dobkin v. C. I. R., 15 T.C. 31 (1950), affirmed 192 F.2d 392 (2d Cir. 1951); See also O. H. Kruse Grain & Milling v. C. I. R., 279 F.2d 123 (9th Cir. 1960) for a list of determining factors.

The factors which indicate to the court that the advances by Drown were loans are (1) Drown's stated intent respecting the advancements that "Such loans shall in no event be considered as capital advanced, but shall in each case be strictly regarded as loans";[3] (2) consistent treatment of these advances as loans on the books of the corporation and of the taxpayer; (3) the issuance of notes as evidence of the debt; (4) the chattel mortgage securing the debts; (5) the original capitalization of Design ($15,000 in stock and $22,000 in loans from Drown) and the originally intended maximum capitalization ($15,000 in stock and $35,000 in loans from Drown) which were adequate;[4] (6) most of the advances were made subsequent to, rather than upon incorporation, after Drown returned from Europe in mid-August, 1946; (7) both Loper and Drown underestimated the amount of money necessary to get the business started; (8) the stock was fully paid for at the time the advances were made; (9) taxpayer's testimony that he did not intend to enhance the value of his stock by cancelling $50,000 in debt. The facts pointing to the conclusion that the advancements, at least up to $50,000, were loans out-

---

3. Exhibit #1, Drown's letter to Loper dated 4/23/46.

4. Compare capitalization plans which have been held inadequate: (1) $2,000 in stock and $26,000 in loans; Dobkin v. C. I. R., supra. (2) Ratio of debt to paid in capital soon after incorporation was 50 to 1; Sogg v. C. I. R., Tax Ct. Mem. 10/4/50, affirmed 194 F.2d 540 (6th Cir. 1952).

weigh those favoring contribution to capital.

 Counsel for the Government also contended that the advancements were worthless when contracted. There can be no deduction for a debt ascertained to be worthless and charged off within the taxable year when the debt was worthless when contracted and when the creditor lent the money with no hope or expectation of repayment. W. F. Young, Inc. v. C. I. R., 120 F.2d 159 (1st Cir. 1941). The criterion is whether or not the person making the advancements considered them to be loans and expected them to be paid. Expectation of repayment may be based solely on anticipated success of the corporate venture, even though such anticipation flows from an excess of confidence. Ewing v. C. I. R. Tax Ct. Mem. 10/4/46. A loan is not rendered worthless because at the time it was made its collection at maturity seems hazardous. Macy v. C. I. R., Tax Ct. Mem. 1/18/49. See also Miriam C. Pierson v. C. I. R., 27 T.C. 330 (1956).

Neither Loper nor Drown had ever been in the business of manufacturing clothes; they underestimated the amount of money necessary to start this business. When Drown returned in mid-August, 1946 from a six-weeks trip to Europe he found it necessary to advance $85,000 to Design to prepare the company for its opening, which was not until October 9, 1946. Though Drown might not have had an excess of confidence in this enterprise, it cannot ·be held from the facts stated above that he did not expect the business to be successful and that the loans, at least up to $50,000, would be repaid. The Court finds that these loans were not worthless when contracted.

The cases cited by the Government which have not heretofore been mentioned are distinguishable on their facts. In W. F. Young, Inc. v. C. I. R., supra, the court found that the officers of the taxpayer corporation believed that the amounts advanced would never be repaid. In Bihlmaier v. C. I. R., 17 T.C. 620 (1951), the taxpayer had written off the advances he made to the corporation the previous year (1945); thus it was found that he believed the advances made in 1946 were worthless when contracted. In Reading Co. v. C. I. R., 132 F.2d 306 (3rd Cir. 1942), the amounts already owing to the taxpayer when he made advances to corporations controlled by him were of such large sums that it was obvious that the subsequent advances were uncollectable when made. In Schnitzer v. C. I. R., 13 T.C. 43 (1949), affirmed 183 F.2d 70 (9th Cir. 1950), cert. denied 340 U.S. 911, 71 S.Ct. 291, 95 L.Ed. 658, advances were made on open account to a corporation formed for the construction and operation of a steel mill. The stockholders knew when the advances were made that the total authorized capital was only one-fourth of the minimum construction costs (approximately $1,-000,000 compared to $250,000 authorized capital, only $187,800 of which was outstanding).

 The plaintiff also claims a deduction of $28,515.54 expenses incurred on a piece of beach property in Santa Monica known as the Marion Davies home. In June of 1947 plaintiff purchased the property and incurred expenses in the early part of 1948. The amounts claimed consisted of:

| | |
|---|---|
| January (1948) expenses | $ 3,727.85 |
| February (1948) expenses | 2,418.94 |
| Salaries and wages | 5,579.85 |
| Depreciation | 5,568.50 |
| Repairs | 11,220.40 |
| Total | $28,515.54 |

Drown held the property in his own name until March 1, 1948, when he sold it to his wholly owned corporation, The Ocean House. Shortly after acquiring the Marion Davies home, Drown Hotels, Inc. purchased two unimproved parcels adjoining this property. At about the time of the Marion Davies transfer, Drown Hotels, Inc. conveyed the adjoining lots to The Ocean House. The issue which these facts present is whether $28,515.54 expended by Drown represented capital expenditure or deductible

expenses. The Government contends (1) the $28,515.54 expenditures were incurred at a time when the property was not being rented and was not held for the production of income; therefore, they are not deductible under § 23 of the Internal Revenue Code of 1939; (2) these expenses were made pursuant to a general plan of reconditioning, improving and altering the whole property and, therefore, are capital expenditures.

In order to be entitled to a deduction, the taxpayer must first show that the expenses were incurred in his trade or business or that they were incurred on property held for the production of income. Internal Revenue Code of 1939, § 23(a) and § 23(l). This property satisfies either requirement. Since Drown's plan was to make a beach club of this property it is properly classified as one of Drown's "dealings in enterprises" and is also property held for the production of income.

The Government's first contention is without substantial merit. Ordinary and necessary expenses incurred in the management or maintenance of a building devoted to rental purposes or held for investment are deductible notwithstanding the fact that there is actually no income therefrom in the taxable year. U. S. Treasury Regulations 111, # 29.23(a)–15(b); See also Mary L. Robinson, 2 T.C. 305 (1943) and Briley v. U. S., 189 F.Supp. 510 (N.D. Ohio 1960).

Directing the court's attention to the Government's second contention, the amounts which Brown claims for January and February (1948) expenses, salaries and wages, and depreciation would have been expended or written off regardless of plaintiff's general plan of reconditioning and altering the property. The Court has examined the itemized January and February expenses and concludes that they were necessary for the maintenance of the property; that they did not materially add to the value of the property nor prolong its life. See U. S. Treasury Regulations 111, # 29.23(a)– 1 and # 29.23(a)–4. Salaries or other

compensations incurred in carrying on a trade or business may be deducted as an ordinary and necessary expense. See Treasury Regulations 101–102, Article 23(a)–6. A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business may be deducted from the taxpayer's gross income. The amount of depreciation taken for 1948 was the same as the unchallenged amount taken in 1947. The Court holds that the taxpayer, with respect to the above-mentioned items, is entitled to a deduction.

The last item listed is a claim of $11,-220.40 as a deduction for repairs. This figure is one-fourth of the total amount ($44,881.60) paid to a Mr. Knebush during the months of January and February, 1948, for work and materials rendered in the improvement of property adjacent to the Marion Davies home and also to the former home of the motion picture celebrity. The taxpayer claims that one-fourth of the total is a reasonable and accurate allocation to repairs, and therefore should be deducted.

The Code contains no provision specifically authorizing the deduction of repairs as such. Thus, repairs are deductible only if they qualify as ordinary and necessary business expenses. Internal Revenue Code of 1939, § 23(a). " * * * A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life." Illinois Merchants Trust Co., 4 B.T.A. 103 (1926). If items are paid out for permanent improvements or betterments made to increase the value of the property, they are nondeductible capital expenditures. See an excellent discussion in Tax Law Review, Vol. 13 (Jan. 1958), pp. 231–242. This determination is one of fact. H. S. Crocker, Inc., 15 B.T.A. 175 (1929).

The testimony at the trial was to the effect that all of the old buildings were painted and required painting regardless of whether or not remodeling was done; that parts of the roof, the screens, win-

dow and doors were put in operating condition; and that approximately 80% of the work done on one of the old buildings was for repairs. The court holds that $11,220.40 is a reasonable allocation to repairs and, therefore, should be deducted.

Judgment will, therefore, be for the plaintiff.

Counsel for plaintiff is directed to prepare and lodge Findings of Fact, Conclusions of Law and form of Judgment in accordance with Local Rule 7, West's Ann.Code.