Herold FELLINGER and Clara Fellinger,
Husband and Wife, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Maurice BERNSTEIN and Irene Bern-
stein, Husband and Wife, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. Nos. C–62–81, C–62–82.

United States District Court
N. D. Ohio, E. D.

Dec. 2, 1964.

Elmer J. Babin, Henry C. Harvey,
Jones, Day, Cockley & Reavis, Cleveland,
Ohio, for plaintiffs.

Merle M. McCurdy, U. S. Atty., Cleve-
land, Ohio, for defendant.

KALBFLEISCH, District Judge.

These are taxpayers' suits seeking re-
covery of income taxes paid for the cal-
endar years 1956, 1957, 1958, and 1959,
which have been consolidated because
they involve the same issue. The tax-
payers are Herold and Clara Fellinger,
husband and wife, and Maurice and Irene
Bernstein, husband and wife. The wives
are parties to the case for the sole rea-
son they filed joint income tax returns
with their husbands; and henceforth
Herold Fellinger, hereinafter termed
"Fellinger," and Maurice Bernstein, here-
inafter termed "Bernstein," will be col-
lectively termed "plaintiffs."

The issue presented to the Court is whether during the years 1956 through 1959 payments of principal received by the plaintiffs on certain instruments which the Hippodrome Building Company, hereinafter termed "Hippodrome," had issued in 1955 as debentures were nontaxable, or whether these payments constituted taxable income in the nature of dividends. Determination of this issue rests on whether certain monetary advances made by plaintiffs to Hippodrome were in the nature of loans or capital contributions, which in turn will rest upon the conclusion to be drawn from the facts stipulated by the parties.

Hippodrome is an Ohio corporation organized on March 9, 1912, and has been in continuous existence since that date. Its principal asset is the Hippodrome Building, located in Cleveland, Ohio. All real estate owned by Hippodrome in 1951 had an appraised fair market valuation of $2,591,000, which remained constant through 1955.

In 1947 Howard A. Lockwood, a nominee of Alfred G. Vanderbilt (hereinafter termed "Vanderbilt") purchased all of Hippodrome's outstanding shares of stock, and in 1948 Hippodrome was reorganized by retiring its capital shares of stock then outstanding and substituting therefor 25,000 shares of stock as follows:

1. 11,350 First Preferred Shares:
   Par value $100.00 per share.
   Preferred Dividend: Quarterly at rate of $4.00 per share cumulatively.
   Redeemable: $100.00 per share plus accrued dividends.
   Issued to: Howard A. Lockwood (as nominee of Alfred G. Vanderbilt).

2. 3,650 Second Preferred Shares:
   No par value—Stated value $.10 per share.
   Preferred Dividend: Quarterly at rate of $4.00 per share to become cumulative and payable af-

ter all First Preferred Shares shall have been redeemed.
   Redeemable after redemption of First Preferred Shares, at $100.-00 per share.
   Issued to: Alfred G. Vanderbilt.

3. 5,000 Third Preferred Shares:
   No par value—Stated value $.05 per share.
   Preferred Dividend: Quarterly at the rate of $4.00 per annum per share, not to become cumulative or payable until all the First Preferred Shares had been retired; thereafter to accrue and become cumulative while the Second Preferred Shares were outstanding but not to be paid until all the Second Preferred Shares had been retired.
   Redeemable after redemption of both First and Second Preferred Shares, at $100.00 per share.
   Issued to: Stuart Scheftel.

4. 5,000 Common Shares:
   No par value—Stated value $.01 per share.
   Issued to: 2,500 shares to Alfred G. Vanderbilt; 2,500 shares to Stuart Scheftel.
   Dividends: Payable only after all preferred shares had been redeemed.

Voting rights in Hippodrome were held exclusively by the holders of the First Preferred Shares until they were retired, and thereafter by the holders of the Second Preferred and Common Shares on the basis of one vote for each share; and holders of the Third Preferred Shares had no voting rights at any time. Thus it is apparent that after the reorganization in 1948 Vanderbilt held control of Hippodrome.

In 1953 Vanderbilt decided to leave Hippodrome and expressed his desire to liquidate for the purpose of recovering his investment; however, Stuart Scheftel, hereinafter termed "Scheftel," de-

sired to continue the corporation. Scheftel and Vanderbilt held various meetings during which Scheftel was told that Vanderbilt would transfer his stock interest to Hippodrome for $1,125,390.

On June 26, 1953, Hippodrome borrowed $1,500,000 from Connecticut General Life Insurance Company at an interest rate of 4% per annum, which obligation was secured by a first mortgage on the corporate real estate. From the proceeds of this mortgage Hippodrome discharged its then existing mortgage liability of $1,248,571.20 and realized $251,428.80 in cash.

Hippodrome held other cash reserves, but it was Scheftel's judgment that $350,000 was required from another source in order to prevent liquidation. Scheftel endeavored for two years to obtain loans from banks and individuals but was unsuccessful until he contacted a Mr. Hexter who in turn directed him to Mr. Babin, hereinafter termed "Babin," to whom Scheftel offered a one-third stock interest in Hippodrome as an inducement for a loan of $350,000. Babin considered this to be unsatisfactory and demanded a one-half stock interest.

After negotiations, two agreements were drawn—one between Hippodrome, Scheftel, and Vanderbilt on September 26, 1955, and the other between Hippodrome, Scheftel, and Babin on October 4, 1955. The terms of these agreements were essentially as follows:

1. Vanderbilt would sell his stock to the corporation for a price of $1,125,390, payable $840,000 by certified check and $285,390 by note secured by a second mortgage on Hippodrome's real estate.

2. Scheftel would contribute his Third Preferred Shares to the Capital Surplus of Hippodrome.

3. The Corporate Charter would be amended to provide for the issuance of $350,000 of Ten Year 4% Subordinated Debentures and for two classes of common stock consisting of 100 shares of Class A and 100 shares of Class B, said shares to have equal voting rights and equal rights upon liquidation, but Class A being entitled to a dividend preference of $50,000 after the debentures have been retired.

4. Babin would pay $349,750 for Hippodrome's entire $350,000 issue of bonds and $250 for the entire issue of 100 shares of Class A.

5. Scheftel would exchange his 2,500 shares of common for the entire issue of 100 Class B shares.

6. Scheftel would organize a corporation to enter into a lease for the theater in the Hippodrome Building, the rental payments to be guaranteed by Scheftel.[1]

7. Hippodrome would enter into a management contract with a designated real estate company owned by Babin.

These terms were contingent on Vanderbilt's receiving a favorable tax ruling, which was forthcoming.

Hippodrome then issued the following:

1. An instrument captioned "The Hippodrome Building Company Ten Year 4% Debenture" in the face amount of $350,000, to the order of Elmer J. Babin or his assigns.

2. A Temporary Stock Certificate for 100 shares of Class A stock to Elmer J. Babin.

3. A Temporary Stock Certificate for 100 shares of Class B stock to Stuart Scheftel.

Babin mailed a letter and report to plaintiffs and several other clients advising them of the possibilities of participation in the advances which Babin had agreed to make to Hippodrome. On October 26, 1955, the $350,000 debenture

---

1. The details of the lease and guarantee are not in evidence, but they are not necessary for disposition of the case.

was cancelled and the following instruments were issued simultaneously to plaintiffs and others for the face amount of each debenture:

| Instrument Designated "Debenture" | | | Instrument Designated "Certificate of Deposit of Class A Shares" by Elmer J. Babin, Trustee |
|---|---|---|---|
| Herold Fellinger | – | $ 25,000 | 5 shares |
| Maurice Bernstein | – | 30,000 | 6 shares |
| Elmer J. Babin | – | 35,000 | 27 shares |
| Elmer J. Babin | – | 5,000 | 1 share |
| Ruth W. Babin | – | 45,000 | 9 shares |
| Irving B. Hexter | – | 30,000 | 16 shares |
| Eva J. Hexter Trust | – | 55,000 | 11 shares |
| Edwin I. Bamberger | – | 25,000 | 5 shares |
| Charles Fox | – | 20,000 | 4 shares |
| Alfred Lewis | – | 10,000 | 2 shares |
| Evelyn Lewis | –. | 10,000 | 2 shares |
| Lester Aurbach | – | 10,000 | 2 shares |
| Anthony W. Babin | – | 10,000 | 2 shares |
| Sidney B. Fink | – | 10,000 | 2 shares |
| Joseph Babin | – | 10,000 | 2 shares |
| Todd Sterling Simon | – | 10,000 | 2 shares |
| Lee Haas | – | 10,000. | 2 shares |
| Totals | | $350,000 | 100 shares |

During the years 1956 through 1959, inclusive, Hippodrome made the following payments to the holders of its securities:

| Date | Designated by Hippodrome's Records as Payment of: | Amount |
|---|---|---|
| 4–26–56 | Debenture Interest to 4–26–56 | $ 7,000.00 |
| 4–26–56 | Debenture Principal—Additional | 8,712.72 |
| 10–26–56 | Debenture Interest to 10–26–56 | 6,825.75 |
| 10–26–56 | Debenture Principal—Regular | 28,500.00 |
| 12–17–56 | Dividend on Class A & B Common Stock | 200.00 |
| 3–29–57 | Debenture Principal—Additional | 25,798.44 |
| 4–26–57 | Debenture Interest to 4–26–57 | 6,169.73 |
| 10–26–57 | Debenture Principal—Regular | 28,500.00 |
| 10–26–57 | Debenture Interest to 10–26–57 | 5,739.78 |
| 12–18–57 | Dividend on Class A & B Common Stock | 200.00 |
| 4–4–58 | Debenture Interest to 4–26–58 | 5,169.78 |
| 10–26–58 | Debenture Principal—Regular | 28,500.00 |
| 10–26–58 | Debenture Interest to 10–26–58 | 5,169.78 |
| 12–23–58 | Dividend on Class A & B Common Stock | 200.00 |
| 3–2–59 | Dividend on Class A Common Stock | 6,250.00 |
| 4–26–59 | Debenture Interest to 4–26–59 | 4,599.78 |
| 6–30–59 | Dividend on Class A Common Stock | 18,750.00 |
| 9–9–59 | Debenture Principal—Additional | 43,037.56 |
| 10–26–59 | Debenture Principal—Regular | 28,500.00 |

The plaintiff Fellinger received the following payments from Hippodrome during the years 1956 to 1959, inclusive:

| Date | Designated by Hippodrome's Records as Payment of: | Amount |
|---|---|---|
| 4–26–56 | Interest on Debenture to 4–26–56 | $ 500.00 |
| 4–26–56 | Debenture Principal—Additional | 622.34 |
| 10–26–56 | Debenture Interest to 10–26–56 | 487.56 |
| 10–26–56 | Debenture Principal—Regular | 2,035.72 |
| 12–17–56 | Dividend on Class A Common Stock | 5.00 |
| 3–29–57 | Debenture Principal—Additional | 1,842.75 |
| 4–26–57 | Debenture Interest to 4–26–57 | 440.68 |
| 10–26–57 | Debenture Interest to 10–26–57 | 409.99 |
| 10–26–57 | Debenture Principal—Regular | 2,035.72 |
| 12–18–57 | Dividend on Class A Common Stock | 5.00 |
| 4–4–58 | Debenture Interest to 4–26–58 | 369.27 |
| 10–26–58 | Debenture Interest to 10–26–58 | 369.27 |
| 10–26–58 | Debenture Principal—Regular | 2,035.72 |
| 12–23–58 | Dividend on Class A Common Stock | 5.00 |
| 3–2–59 | Dividend on Class A Common Stock | 312.50 |
| 4–26–59 | Debenture Interest to 4–26–59 | 328.56 |
| 6–30–59 | Dividend on Class A Common Stock | 937.50 |
| 9–9–59 | Debenture Principal—Additional | 3,074.10 |
| 10–26–59 | Debenture Interest to 10–26–59 | 313.18 |
| 10–26–59 | Debenture Principal—Regular | 2,035.72 |

The plaintiff Bernstein received the following payments from Hippodrome during the years 1956 to 1959, inclusive:

| Date | Designated by Hippodrome's Records as Payment of: | Amount |
|---|---|---|
| 4–26–56 | Debenture Interest to 4–26–56 | $ 200.00 |
| 4–26–56 | Debenture Principal—Additional | 248.93 |
| 10–26–56 | Debenture Interest to 10–26–56 | 195.02 |
| 10–26–56 | Debenture Principal—Regular | 814.28 |
| 12–17–56 | Dividend on Class A Common Stock | 6.00 |
| 3–29–57 | Debenture Principal—Additional | 737.10 |
| 4–26–57 | Debenture Interest to 4–26–57 | 176.29 |
| 10–26–57 | Debenture Interest to 10–26–57 | 164.00 |
| 10–26–57 | Debenture Principal—Regular | 814.28 |
| 12–18–57 | Dividend on Class A Common Stock | 6.00 |
| 4–4–58 | Debenture Interest to 4–26–58 | 147.71 |
| 10–26–58 | Debenture Interest to 10–26–58 | 147.71 |
| 10–26–58 | Debenture Principal—Regular | 814.28 |
| 12–23–58 | Dividend on Class A Common Stock | 6.00 |
| 4–26–59 | Debenture Interest to 4–26–59 | 131.42 |
| 9–9–59 | Debenture Principal—Additional | 1,229.65 |
| 10–26–59 | Debenture Interest to 10–26–59 | 125.28 |
| 10–26–59 | Debenture Principal—Regular | 814.28 |

The Commissioner of Internal Revenue assessed deficiencies against the plaintiffs for failure to pay taxes with respect to the distributions of principal. The assessments were paid, and following refusal of plaintiffs' claims for refund suit was brought in this Court.

■ In considering whether the advances to Hipprodrome were in the nature of loans or capital contributions the essential difference between a shareholder and creditor of a corporation should be kept in mind. The Sixth Circuit Court of Appeals set forth this difference in United States v. Title Guarantee & Trust Co., 133 F.2d 990, 993 (1943):

> "*The essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit.* The creditor, on the other hand, does not intend to take such risks so far as they may be avoided, but merely to lend his capital to others who do intend to take them."

In determining whether a creditor-debtor or a stockholder relation was formed the Court of Appeals stated (id. p. 993):

> "In the determination of the question before us, the cases agree that the decisive factor is not what the payments are called, but what in fact they are; and that if taken as a whole, the evidence shows a relation of debtor and creditor, the payments made on account of that relation, will be interest, no matter how called, while if taken as a whole, the evidence shows a stockholding relation, the payments made will be dividends, equally no matter how called. * * * In each case it must be determined whether the real transaction was that of an investment in the corporation or a loan to it."

■ The principle to be used in arriving at a determination of this question has recently been restated by the Sixth Circuit Court of Appeals in Moughon v. C. I. R., 329 F.2d 399, 401 (1964):

> "This and other courts have established the principle that while numerous criteria may exist as guide lines helpful in making the final factual determination as to the true character for tax purposes of a transaction, no single factor can be decisive. Gooding Amusement Co. v. Commissioner, 236 F.2d 159 (6th Cir. 1956), Consumers Credit Rural Electric Cooperative Corp. v. Commissioner, 319 F.2d 475 (6th Cir. 1963). See also Gilbert v. Commissioner, 248 F.2d 399 (2nd Cir. 1957), affirmed 262 F.2d 512 (2nd Cir. 1959), cert. denied 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030. The determination as to whether for purposes of the section of the Internal Revenue Code of 1954 here under consideration the debentures constituted evidences of an indebtedness was one to be made by the Tax Court in the light of all of the surrounding facts and circumstances, and in view of the record before us it cannot be said that its determination was clearly erroneous."

Thus the Court must consider the factors present in this case to determine the plaintiffs' relationship with Hippodrome. This problem has been commented upon in 4 Law of Federal Income Taxation (1960 Revision), Mertens, Section 26.10:

> "Frequently, the equivocal character of the alleged stock or obligation is designed to give the issuers opportunities to argue that either stock or an obligation was intended, whichever suits their best interests. There may be preferred shares which are denominated notes and bonds and, conversely, there may be notes or bonds described as preferred shares. Due to unlimited ingenuity in this field, it is hazardous to find moulds into which all forms of stock, securities or other obligations can, with certainty, be poured. In any event, the basic question in each case is whether the payees are creditors

or stockholders. Unrewarding as it may sound, it is nevertheless true that whether a payment represents interest on an indebtedness or a dividend or other corporate distribution to stockholders must depend on a consideration of all the pertinent facts."

A comprehensive list of factors which have been considered by the courts is set forth in Sections 26.10a, 26.10b, and 26.10c, id.:

"1. Did the parties intend at the time of the issuance of the original documents to create a debtor-creditor relationship? * * *

"2. Although not conclusive, what nomenclature and labels have been used? * * *

"3. Does the obligation have a definite maturity date fixed or ascertainable? That feature is ordinarily the essential element of a creditor investment. The fact that ultimately there must be paid a definite sum at a fixed time marks the relationship to the corporation as that of creditor rather than shareholder. There must exist the right to demand payment unconditionally at a fixed time. * * *

"4. Does the instrument give a preferred position as to the payment of interest and principal at maturity? * * * The subordination of a certificate holder to holders of mortgage bonds, while an attribute of preferred stock, is a provision also often applied to bonds.

"5. Do the holders of the securities have voting powers? Voting powers are not usually incidental powers granted under creditor instruments. * * *

"6. Does the instrument bear a fixed rate of interest? Although the fact that interest is payable exclusively out of profits will not itself destroy the debt nature of a corporate debenture, it together with other factors may be sufficient to tip the scales in favor of a proprietary rather than debtor-creditor relationship. * * *

"7. Does the instrument have redemption or retirement provisions? A redemption provision is a characteristic of a creditor instrument. * * *

"8. Is the obligation to pay positive and unconditional or subject to a contingency? Ordinarily, indebtedness is founded upon a positive obligation to pay. * * *

"9. Is the security redeemable at the election of the holder? A provision that stock is redeemable at the election of the stockholders upon notice prior to any dividend payments does not make a debt. * * *

"10. What is the amount and reality of the risk involved? * *" (Section 26.10a.)

"[11.] The implications of that statement have been seized upon by lower courts since 1946 to add another test for the determination as to whether a payment is of interest or of a dividend, namely, the test of so-called 'thin' capitalization. * * No one can point with certainty to the line separating 'thin' or 'inadequate' capitalization from 'adequate' capitalization. * * * There is no doubt that a disproportionately high debt structure is a suspicious circumstance and calls for inquiry into whether the indebtedness is really what it appears to be. But there is no rule of thumb that automatically classifies a debt as a sham merely because of a high debt-to-equity ratio." (Sections 26.10b and 26.10c.)

In considering the factors in the present case defendant's claim of "thin" capitalization cannot be sustained, in light of the fact that in 1955 Hippodrome held real estate valued at $2,591,000 in addition to stock having a stated value of $500. This real estate must be considered as capital subject to Hippodrome's primary indebtedness of $1,-500,000 on the first mortgage, and $285,-

390 on the second mortgage, and the debentures of $350,000. See Earle v. W. J. Jones & Son, 9 Cir., 200 F.2d 846, 850–51 (1952).

An important factor in this case is the intent of the plaintiffs in making the advances to Hippodrome. Following are portions of plaintiffs' testimony:

1. *Bernstein's testimony.*

Tr., page 10:

"Q Would you have been interested at that time in investing $10,-000 [2] in the stock of the Hippodrome Building Company?

"A I would not.

"Q In making this investment what were you relying on? What was the purpose in making this investment?

"A I thought I had a very safe investment with a guaranteed interest rate and a possibility of profit in the common stock that I was getting with the deal.

"Q How long did you anticipate it would take you to get your $10,000 loan repaid?

"A Five or six years.

"Q Would you have been willing to make this loan for the four per cent interest alone?

"A No, I would not.

"Q What would you want in addition to that?

"A Well, some possibility of enhancement in the value of the stock or something. The four per cent would not be attractive, and [sic] attractive investment for me."

Tr., page 14:

"Q The common stock did interest you?

"A Surely. That had a chance, based on the prospectus that it could have value.

"Q Did that interest you because after your debt was paid off,

and you received the $10,000 back plus interest, you would still have some ownership left in the company?

"A Yes, certainly.

"Q You anticipated that the stock which you would be left with would be worth something?

"A Of course, that is true."

Tr., pages 16–17:

"Q Is it fair to say you relied on the documents sent to you by Mr. Babin?

"A Oh, yes, I thought the appraised value of the real estate was worth $2,000,000. Yes, I am sure he thought so, or it wouldn't be here. This is the net result of all these figures.

"Q Showing the common stock is worth $590,000. You knew there were going to be only 200 shares of common stock outstanding?

"A Yes."

Tr., pages 17–18:

"Q Did you make any determination, or was anything brought to your attention, about what the forced sale value of the building might be?

"A If we had thought about it, I wouldn't have gone into the deal for the purpose that I say.

"Q Why?

"A You mean forced sale—you mean on the open market?

"Q Yes.

"A I wouldn't consider the deal if that question had arisen.

"Q Because there would be no chance for profit?

"A This figure probably wouldn't have been correct.

\* \* \*

"Q If you were considering what the forced sale value of the

---

**2.** The sum of $10,000 differs from the stipulated facts which state that Bernstein advanced $30,000. This is not crucial.

building was you wouldn't have gone into the deal?

"A    I wouldn't have considered the deal if that thought ever crossed my mind."

2.  *Fellinger's testimony.*

Tr., pages 27–28:

"Q    Would you have been willing to loan the Hippodrome Building Company $25,000 if all you obtained was a note bearing four per cent interest?

"A    I doubt it.

          *   *   *

"Q    At the time you got it, did you think this particular stock was worth something?

"A    It was worth something, certainly.

          *   *   *

"Q    Would you have been willing to invest $25,000 in stock of the Hippodrome Building Company if you would not be a creditor of that company?

"A    You mean on the assumption those two mortgages were still in effect?

"Q    Yes, at that time.

"A    No."

Tr., page 33:

"Q    Was your motivation in going into this transaction the fact that after your alleged debenture was paid off you still had ownership interest in the corporation?

"A    That is correct.

"Q    And that is where you expected to make certain additional money, that is, by having that common stock have as great a value as possible?

"A    You are implying that I would be able to make this common stock increase in value?

"Q    That was your motivation in going into the deal at all, to see if the common stock could go as high as possible?

"A    I hoped it would go as high as it could."

■   From this testimony it can be seen that the plaintiffs' advances were dependent upon receipt of both debentures and stocks; that is, the advances would not have been made unless plaintiffs were given the opportunity to obtain an ownership. interest in Hippodrome. As finally consummated, for every $5,000 advanced plaintiffs received a debenture for $5,000 at 4% interest, plus one share of stock. Both plaintiffs testified they took into consideration the fact that in Babin's letter it was stated that each share had an "intrinsic value" of $7,000. (Tr. pp. 17, 29.) Furthermore the shares were voting shares. It is therefore apparent that plaintiffs intended to obtain a capital interest in Hippodrome.

On the other hand, the plaintiffs also testified they were making a relatively safe loan; however, determination of a taxpayer's intent rests upon his objective intent as disclosed by the various factors in the case and not just upon his own formal manifestations. Drown v. United States, D.C., 203 F.Supp. 514 (1962); reversed on other grounds, 9 Cir., 328 F. 2d 314 (1964).

■   Examination of the debentures must be made in considering other factors involved in this case. The instruments received by the plaintiffs are designated as being debentures, but this is not necessarily determinative of what they are in fact. United States v. Title Guarantee & Trust Co., supra.

The debentures are to pay interest of 4% semi-annually and paragraph (a) of the debentures states that in the event of nonpayment thirty days after the due date the principal amount outstanding could be declared in default and it then would be due and payable. However, the right to declare a default is not an absolute right—the registered owners "of not less than seventy-five per cent (75%) in aggregate principal amount of this issue of Debentures" must agree on declaration of a default.

Paragraph (j) of the debentures states:

"Subject to the provisions of paragraphs (c) and (d) hereof, the terms of the Debentures of this issue may be modified by the Company upon the written consents of the registered owners of not less than seventy-five per cent (75%) in aggregate principal amount of this issue of Debentures at the time outstanding."

Paragraphs similar to paragraphs (a) and (j) of the debentures in question have been commented upon in R. C. Owen Company v. United States, Ct.Cl., 180 F.Supp. 369, 372 (1960); cert. denied 363 U.S. 819, 80 S.Ct. 1256, 4 L.Ed. 2d 1516 (1960):

"The holders of the debentures acquired certain voting rights not ordinarily characteristic of debentures. For instance, in the event of default by the corporation, only upon the vote of 75% in amount of the debentures can the debentures be declared due and payable.

"Also, there is the specific provision that 'all provisions and agreements' of the debentures, 'insofar as they affect the holders hereof, may be changed, altered or amended by a vote in writing by the holders of these Debenture Bonds holding 75% of the principal amount thereof.' There follows a provision that, following notification of a vote for a change or alteration, the 'Company is authorized and empowered' to issue new debentures embodying the change. At the least, these provisions give certain important voting rights to the debenture holders. Although it may be that the entire provision only empowers 75% in amount of the debenture holders to make changes and alterations with the agreement of the corporation, it might well be contended that, by an affirmative vote of 75% in amount of the debenture holders, the provisions of the debentures may be changed at will, even to the extent of increasing the interest rate or accelerating the maturity. If such be the case, the holders of the debentures would have almost as much control of the corporation as common stockholders."

Such is the case with the Hippodrome debentures. For instance, the seemingly fixed maturity date could be modified in any manner, and in fact an extension of ten years has been declared legal if properly performed in accord with the provisions of the instrument concerned. See Aladdin Hotel Co. v. Bloom, 8 Cir., 200 F.2d 627 (1953).

Furthermore, there is no provision for a sinking fund from which to retire the debentures at maturity, but there is provision for annual payment of principal. The formula for this payment is contained in paragraph (d) (4) (A), (B) and (C), but it is specifically limited by the following portion of paragraph (d) (4):

"provided that (I) no payment shall be made to the holders of this issue of Debentures pursuant to clause (A) of this subparagraph unless, at the time of such payment, the Company is not in default in the payment of interest on or principal of any indebtedness of the Company secured by mortgage; (II) the amounts referred to in clauses (B) and (C) of this subparagraph shall be paid only out of available income; (III) the amounts referred to in clauses (B) and (C) of this subparagraph shall not be paid to the extent that such payment shall increase the ratio of current liabilities to current assets (as certified by the Company's independent accountants pursuant to clauses (C) and (D) of subparagraph (2)) above the ratio of two and a quarter (2¼) to one (1); and (IV) payments pursuant to clause (A), (B) and/or (C) of this subparagraph shall not be cumulative;"

Thus there is no guarantee of an annual payment, since a continuation of corpo-

rate earnings is a prerequisite to annual payments.

It is also apparent that plaintiffs were not relying on their right to force repayment of the debentures at maturity ten years from the date of issuance, because both testified they expected the debentures to be paid off in five or six years. (Tr., pp. 10, 32.) In other words, plaintiffs were relying *primarily* upon continued corporate earnings for repayment of the debentures, which in these circumstances furnishes further evidence that plaintiffs were investing in Hippodrome rather than loaning money to it.

Further provision for payment of principal is set forth in paragraph (d) (5):

"If no part of the Company's indebtedness to Vanderbilt is then outstanding, the Company shall pay, from time to time, on account of the principal amount then owing on this issue of Debentures such amounts as, in the opinion of the Board of Directors of the Company shall not be required by the Company, from time to time, as a reserve for operating expenses, capital improvements and taxes."

Such a provision for payment of principal is highly analogous to the manner in which a corporation decides whether or not to declare a dividend and casts further suspicion on the so-called debentures issued to the plaintiffs.

In 1959 dividends totaling $25,000 were paid to Class A stockholders despite paragraph (b) (3) of the debentures which states that no dividends would be paid while any debentures were outstanding. Babin testified (Tr. 64) that this was done with the consent of the debenture holders pursuant to their agreement with Hippodrome. Babin further testified that the $25,000 dividends were paid for the following reason:

"A * * * That was an unanticipated thing. I explained in my direct examination, it was due entirely to the fact that the theatre corporation found difficulty in paying $100,000 rent, and they asked for a reduction. You will recall Mr. Scheftel— this was his theatre corporation—and he guaranteed this lease, and he owned the other half of the stock; so we agreed, with the consent of the debenture holders, that his rent would be reduced from $100,-000 to $75,000, and the Class A shareholders would receive a $25,000 dividend and Class B wouldn't receive anything."

Thus we find so-called debenture holders acquiescing in a modification which is inconsistent with their rights as creditors, but which is not necessarily inconsistent with their rights as stockholders. This is not to say that action taken in 1959 is controlling, but it does furnish corroborating evidence to the claim that the plaintiffs did not at the time they obtained the debentures intend to assert their rights of bona fide creditors. See Gooding Amusement Co. v. Commissioner, 236 F.2d 159, 163 (6th Cir. 1956), cert. denied 352 U.S. 1031, 77 S.Ct. 595, 1 L.Ed.2d 599 (1957), in which the Tax Court made an analogous finding and was affirmed by the Sixth Circuit Court of Appeals.

Upon the facts and circumstances as the Court finds them, and applying the appropriate law, it is the Court's conclusion that the plaintiffs were in a stockholding relationship with Hippodrome rather than a creditor-debtor relationship, and thus the sums paid plaintiffs as so-called repayments of principal on debentures in reality represented taxable dividends. This determination eliminates any necessity for consideration of defendant's alternate theory, and judgment will be rendered for defendant.

The foregoing is adopted as findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure.