The Hippodrome Building Company, a corporation v. Commissioner. Edwin I. Bamberger and Rita Bamberger v. Commissioner.
Hippodrome Bldg. Co. v. Commissioner
Docket Nos. 95333, 95334.
United States Tax Court
T.C. Memo 1965-25; 1965 Tax Ct. Memo LEXIS 305; 24 T.C.M. (CCH) 113; T.C.M. (RIA) 65025; February 11, 1965
Elmer J. Babin, 1220 Huron Rd., Cleveland, Ohio, for the petitioners. Joseph P. Crowe, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in the income tax of petitioners for the years and in the amounts as follows: Docket
Taxable
Defi-
No.
Petitioner
year
ciency
95333
Hippodrome Building
Co.
1956
$7,439.90
1957
6,108.72
1958
5,277.77
1959
4,527.86
95334
Edwin I, and Rita Bam-
berger
1957
1,893.40 The sole issue for decision in these consolidated cases is whether certain instruments, issued by the Hippodrome Building Company and designated as debentures, represent a bona fide indebtedness on the part of *306 the company or whether they merely manifest a proprietary equity on the part of the holders thereof. Findings of Fact Some of the facts were stipulated by the parties. Their stipulation, together with attached exhibits, is incorporated herein by this reference. The Hippodrome Building Company (hereinafter sometimes referred to as Hippodrome) is an Ohio corporation, having its principal place of business in Cleveland, Ohio. Its Federal corporation income tax returns for the calendar years 1956 through 1959, made on the accrual basis, were filed with the district director of internal revenue, Cleveland, Ohio. Edwin I. and Rita Bamberger are husband and wife residing in Cleveland, Ohio. Their joint Federal income tax return for the year 1957, made on the cash basis and for the calendar year period, was filed with the district director of internal revenue, Cleveland, Ohio. The Hippodrome Building Company was originally organized on March 9, 1912, and has been in continuous existence since that date. Its principal asset was and is the Hippodrome Building, a substantial commercial structure located in Cleveland, Ohio, which houses, among others, an office building and a theatre. *307 On April 15, 1947, pursuant to an agreement between Alfred G. Vanderbilt (hereinafter referred to as Vanderbilt) and Stuart Scheftel (hereinafterreferred to as Scheftel), Howard A. Lockwood, as nominee of Vanderbilt, acquired 10,000 shares of the common stock of Hippodrome, representing all of its then, issued and outstanding shares. Of the 10,000 shares, 9,995 were issued in the name of Howard A. Lockwood and the remaining five shares were issued to others. On June 9, 1948, the Articles of Incorporation of Hippodrome were amended and the company was reorganized by retiring all of its capital shares of stock outstanding and substituting therefor 25,000 shares of stock as follows: 11,350 First Preferred Shares: Par Value $100.00 per share Preferred Dividend; quarterly at rate of $4.00 per share cumulatively; Redeemable: $100.00 per share plus accrued dividends; Issued to: Howard A. Lockwood (as nominee of Alfred G. Vanderbilt) 3,650 Second Preferred Shares: No par value - stated value, $.10 per share; Preferred Dividend: quarterly rate of $4.00 per share to become cumulative and payable after all First Preferred shall have been redeemed. Redeemable after redemption *308 of First Preferred, at $100.00 per share; Issued to: Alfred G. Vanderbilt 5,000 Third Preferred Shares: No par value - stated value $.05 per share; Preferred Dividend: quarterly at the rate of $4.00 per annum per share, not to become cumulative or payable until all the Frist Preferred Shares had been retired; thereafter to accrue and become cumulative while the Second Preferred Shares were outstanding but not to be paid until all the Second Preferred Shares had been retired. Redeemable after redemption of both First and Second Preferred, at $100.00 per share Issued to: Stuart Scheftel 5,000 Common Shares: No par value - stated value $.01 per share; Issued to: 2,500 shares to Alfred G. Vanderbilt; 2,500 shares to Stuart Scheftel Dividends: Payable only after all preferred shares had been redeemed. Voting rights in Hippodrome were held exclusively by the holders of the First Preferred Shares until they were retired; thereafter by the holders of the Second Preferred and Common Shares on the basis of one vote for each share. Holders of the Third Preferred Shares at no time had any voting rights. Thus, immediately after the reorganization and pursuant thereto Vanderbilt *309 possessed voting control of Hippodrome. Some time in early 1953 Vanderbilt expressed to Scheftel his desire to liquidate Hippodrome for the purpose of withdrawing his investment therefrom. Scheftel, however, was desirous of continuing the corporation, and he accordingly prevailed upon Vanderbilt not to force a liquidation, but instead to sell to Hippodrome his stock interest therein. Vanderbilt agreed to this plan and offered to sell his stock to the corporation for a price of $1,125,390 to be paid $840,000 in cash and the balance, or $285,390, in the form of a corporate note secured by a mortgage on all of Hippodrome's property. As of the beginning of 1953, Hippodrome had cash reserves in the amount of $307,565.69. In addition, its chief asset, the Hipprdrome Building, had a fair market value of $2,581,000 although subject to a mortgage liability in favor of the Connecticut General Life Insurance Company in the amount of $1,248,571.20. In an effort to raise sufficient cash funds with which Hippodrome might purchase Vanderbilt's stock, Scheftel negotiated with the Connecticut General for a refinancing of its first mortgage. Connecticut General indicated that the maximum loan it *310 was willing to make was $1,500,000 and on June 26, 1953, it advanced this sum to Hippodrome at an annual interest rate of 4 percent with repayment secured by a first mortgage on the Hippodrome Building. From the proceeds of this loan Hippodrome discharged its then existing mortgage liability of $1,248,571.20 and realized $251,428.80 in cash. This sum, together with its available cash reserves, was, however, some $350,000 short of the $840,000 in cash needed by Hippodrome to purchase Vanderbilt's stock interest. For the next two years Scheftel contacted a number of banks and private individuals in an unsuccessful effort to arrange a loan to Hippodrome for the additional cash requirement of $350,000. Finally, some time in 1955, Scheftel was introduced by one Irving Hexter to Elmer J. Babin (hereinafter sometimes referred to as Babin), an attorney. Scheftel related to Babin the details of Vanderbilt's offer and inquired whether he would be interested in lending Hippodrome $350,000. Babin replied that a group which he would represent might be interested in furnishing the money but only in the event that they receive, in addition to interest, one-half of the common stock of the corporation. *311 Although Scheftel's original proposal had been merely for a "straight" loan, he indicated that he would be willing for Babin and his group to have one-third of the common stock of Hippodrome. This Babin considered to be unsatisfactory and he reiterated his demand for one-half of the stock. Reluctant to give up so large an interest, Scheftel suggested to Babin that, should he be concerned merely with voting control of Hippodrome, an arrangement could be entered into setting up a voting trust in which Babin's one-third interest would vote equally with Scheftel's two-thirds interest. Again Babin refused to settle for any thing less than half of the common stock. Scheftel considered the acquisition by Hippodrome of the $350,000 offered by Babin to be "a question of life and death to the corporation" because without it there would have been no means "to satisfy Vanderbilt and prevent him from liquidating the company [or] * * * to carry on with the company" after Vanderbilt had been satisfied. Ultimately, he therefore agreed to Babin's demand. Subsequently, two agreements, one between Hippodrome, Scheftel, and Vanderbilt dated September 26, 1955, and the other between Hippodrome, Scheftel, *312 and Babin dated October 4, 1955, were entered into. The terms of those were essentially as follows: 1. Vanderbilt would sell his stock to the corporation for a price of $1,125,390, payable $840,000 by certified check and $285,390 by note secured by a second mortgage on Hippodrome's real estate. 2. Scheftel would contribute his Third Preferred Shares to the capital surplus of Hippodrome. 3. Hippodrome would amend its corporate charter to: (a) provide for the issuance of $350,000 in "4% Ten Year Registered Debentures"; and (b) reduce its stated capital so that henceforth it would be authorized to issue only 100 shares of new Class A Common stock having a par value of $2.50 per share and 100 shares of new Class B Common stock having a par value of $2.50 per share, both of such shares to have equal voting rights. (c) Babin would pay Hippodrome $349,750 for its entire issue of debentures and $250 for its entire issue of 100 shares of Class A Common stock. (d) Scheftel would exchange his 2,500 shares of old common stock for Hippodrome's entire issue of new Class B Common stock. (e) Scheftel would organize a corporation for the purpose of entering into a lease, and Hippodrome *313 would enter into such lease, for the theatre located in the Hippodrome Building, the rental payments to be guaranteed by Scheftel. (f) Hippodrome would enter into a management contract with a designated real estate company owned by Babin. In the early stages of his negotiations with Scheftel, Babin had approached a limited group of individuals, all of whom, with one exception, were clients of his and persons who had invested with him on previous occasions. To each of them, including petitioner Edwin I. Bamberger, he submitted a letter and statement regarding a proposed investment in Hippodrome. The letter stated, in part, as follows: What makes the deal attractive is that, for each $10,000.00 debenture, you will receive at a cost of only $2.50, one share of Class A common stock having an intrinsic value of $7,000.00 and entitling you to cumulative preferred dividends of $1,000 per year plus 1% of all common dividends. Although the terms of this letter contemplate the issuance by Hippodrome of only 50 shares of Class A common stock the terms of the September 26 and October 4, 1955, agreements provide for the issuance of 100 such shares. Of these 100 shares, 20 were to go to *314 Babin and 10 to Irving Hexter for "finding" the deal and for assuming personal liability thereunder until such time as the others to be associated with them in the Babin group were brought in. The remaining 70 shares were to be allocated amongst all those in the group in the ratio of two shares for each $10,000 of debentures purchased. On October 26, 1955, the transactions between Hippodrome, Vanderbilt, Scheftel, and Babin were completed pursuant to the agreements, at which time Hippodrome issued the following: An instrument captioned "The Hippodrome Building Company Ten Year, 4% Debenture" in the face amount of $350,000 to the order of Elmer J. Babin or his assigns. A Temporary Stock Certificate for 100 shares of Class A stock of Elmer J. Babin. A Temporary Stock Certificate for 100 shares of Class B Stock to Stuart Scheftel. The consideration due Vanderbilt for his stock, totaling $1,125,390, was satisfied in the following manner: Hippodrome delivered to Vanderbilt
a certified check in the amount of:
$ 490,250
A cashier's check from the Babin
group in the amount shown was
endorsed by the officers of Hippo-
drome and delivered to Vanderbilt
349,750
Hippodrome issued its promissory
note to Vanderbilt
285,390
$1,125,390
*315 In addition to the above amount of $349,750 paid by the Babin group, said group paid the amount of $250 to Hippodrome, designated as the purchase price of the 100 shares of Class A Common stock of Hippodrome. The express terms and provisions of the shares of Class A and Class B stock of Hippodrome were set forth in paragraph (b) of each of the Temporary Stock Certificates referred to above. The express terms and provisions pertaining to each class were as follows: I. While any of the Corporation's 4% Ten Year Debentures are outstanding, the Corporation shall not declare, nor pay, nor set apart for payment any dividend on either class of stock of the Corporation. II. From and after the time when the Corporation shall have retired the last of its said 4% Ten Year Debentures outstanding, the holders of Class A shares, as a class, shall be entitled to receive cumulative dividends at the rate of $50,000.00 a year, when and as declared by the Board of Directors, out of surplus or net profits of the Corporation, in preference and priority to payment of any further dividends for such year. III. All remaining surplus or net profits for each such year shall be available for equal dividends *316 to the holders of Class A shares, as a class, and the holders of Class B shares, as a class, if, as and when declared by the Board of Directors. IV. Upon liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary: A. The holders of Class A shares shall be entitled to receive payment in full of all unpaid cumulative dividends (as provided in Article FOURTH (b)(II)) to the date of such liquidation, dissolution or winding up, in preference and priority to the payment or distribution of any further assets of the corporation; B. The assets of the Corporation remaining after payment of unpaid cumulative dividends, if any, pursuant to Article FOURTH (b)(II) shall be paid or distributed equally among the holders of Class A shares, as a class, and the holders of Class B shares, as a class. FIFTH: There shall be two classes of directors to be known as Class A directors and Class B directors, respectively. The number of Directors shall be four. There shall be two Class A directors and two Class B directors. The holders of Class A shares, voting separately as a class, shall elect the Class A directors. The holders of Class B shares, voting separately as *317 a class, shall be entitled to elect the Class B directors. Except as hereinabove provided, the holders of Class A shares, as a class, and the holders of Class B shares, as a class, shall have equal voting power. As of October 26, 1955, the instrument captioned "The Hippodrome Building Company Ten Year, 4% Debenture" was cancelled and the following instruments were issued simultaneously: Instrument designated
"Certificate of Deposit
of Class A Shares" by
Instrument designated debenture
Elmer J. Babin, Trustee
No. of
Amount
Number
shares
Number
Elmer J. Babin
$ 35,000
2
27
1
Elmer J. Babin
5,000
3
1
2
Ruth W. Babin
45,000
4
9
3
Irving B. Hexter
30,000
5
16
4
Eva J. Hexter Trust
55,000
6
11
5
Herold Fellinger
25,000
7
5
6
Maurice Bernstein
30,000
8
6
7
Edwin I. Bamberger
25,000
9
5
8
Charles Fox
$ 20,000
10
4
9
Alfred Lewis
10,000
11
2
10
Evelyn Lewis
10,000
12
2
11
Lester Aurbach
10,000
13
2
12
Anthony W. Babin
10,000
14
2
13
Sidney B. Fink
10,000
15
2
14
Joseph Babin
10,000
16
2
15
Todd Sterling Simon
10,000
17
2
16
Lee Haas
10,000
18
2
17
Totals
$350,000
100
*318 The Class A Common shares of stock of Hippodrome were placed in a trust, with Elmer J. Babin as trustee, and as evidence thereof, the "Certificates of Deposit of Class A Shares" referred to above were issued. Elmer J. Babin personally voted all of the Class A Common shares of Hippodrome. The debentures issued by Hippodrome were captioned "The Hippodrome Building Company Ten Year 4% Debenture, Issue Limited to $350,000.00, Due October 26, 1965." In addition to providing for payment of the principal amount in 10 years and for interest at the rate of 4% per annum, payable semi-annually, they also provided, in part, as follows: (a) If any installment of interest on this issue of Debentures shall become due and shall remain unpaid, in whole or in part, for a period of thirty (30) days or more from its due date, the registered owners of not less than seventy-five percent (75%) in aggregate principal amount of this issue of Debentures at the time outstanding may, by notice in writing to the Company, declare the principal amount thereof in default and, upon such declaration (subject to the provisions of paragraphs (c) and (d) hereof), the entire unpaid principal amount of this Debenture *319 shall become due and payable. (b) While any Debentures of this issue are outstanding, the Company shall not (1) apply any of its funds to the payment, redemption, purchase or acquisition of any indebtedness of the Company which is subordinate to this issue of Debentures, (2) apply any of its funds to the redemption, purchase, or acquisition of any shares of any class of stock of the Company, (3) declare or pay any dividends or make any other distributions on any shares of any class of stock of the Company, or (4) without the written consents of the registered owners of not less than seventy-five percent (75%) in aggregate principal amount of this issue of Debentures at the time outstanding consent to any amendment to any mortgage or mortgage notes of the Company which shall be prejudicial to the interests of the registered owners of this issue of Debentures. (c) Except as to the payment of interest on this issue of Debentures, and subject to the provisions of paragraph (d) hereof, this issue of Debentures shall be in all respects subordinate to the principal of and interest on the indebtedness of the Company to Alfred G. Vanderbilt (hereinafter referred to as Vanderbilt) secured *320 by a mortgage in the original amount of Two Hundred Eighty-Five Thousand Three Hundred Ninety Dollars ($285,390.00), made by the Company to Vanderbilt, which mortgage constitutes a lien on all real and tangible personal property of the Company. Said indebtedness is hereafter referred to as "the Company's indebtedness to Vanderbilt." (d)(1) After the close of each fiscal year of the Company, the independent accountants of the Company shall compute the net income of the Company for such fiscal year after provision for Federal taxes on income. Such net income shall be computed in accordance with generally accepted accounting principles and shall correspond to that shown in the Statement of Profit and Loss which is a part of such accountants' report for such fiscal year. Such computation shall be binding and conclusive upon all holders of this issue of Debentures. (2) In addition to the computation to be made pursuant to subparagraph (1), the independent accountants of the Company shall certify to the Company after the close of each such fiscal year (A) the total amount paid or payable by the Company for such fiscal year on account of (I) all principal indebtedness of the Company secured *321 by mortgage and (II) all other principal indebtedness represented by loans to the Company except the indebtedness represented by this issue of Debentures; (B) the total amount that would be payable by the Company for such fiscal year to Transcontinental Properties, Inc. (hereinafter referred to as "Transcontinental") under the original agreement between the company, Transcontinental and Howard A. Lockwood, dated October 20th, 1947, as amended by agreement between Transcontinental and the Company bearing even date herewith; (C) the current assets of the Company as of the date of the accountants' report; and (D) the current liabilities of the Company (excepting any liability to the holders of this issue of Debentures accrued or accruing by reason of the provisions of clauses (B) and (C) of subparagraph (4)). as of the date of the accountants' report. (3) For the purposes of subparagraph (4), "available income" is defined as the amount computed as follows: (A) there shall be added to the net income of the Company for each such fiscal year, as computed pursuant to subparagraph (1), the total of all (I) depreciation, (II) amortization of mortgage expense, and (III) amortization of leasing *322 commissions and tenant alterations expense deducted in the computation of net income for such year; and (B) from the total so obtained there shall be deducted the total of the amounts certified by the accountants pursuant to clauses (A) and (B) of subparagraph (2). (4) Within three (3) business days after delivery to the Company by its independent accountants of certifications of each and all of the amounts referred to in subparagraphs (1) and (2), and if, at the time, any of the Company's indebtedness to Vanderbilt is still outstanding, the Company shall pay on account of the principal amount then owing on this issue of Debentures an amount which shall not exceed the sum of the following amounts: (A) the amount certified pursuant to clause (B) of subparagraph (2), but only to the extent that the same shall not have been paid to Transcontinental by reason of a waiver, in writing, by Transcontinental of the right to receive such amount so waived; (B) Twenty-eight Thousand Five Hundred Dollars ($28,500.00); and (C) an amount equivalent to the amount payable to Vanderbilt as additional amortization (as such term is defined in the mortgage note and mortgage delivered by the Company to *323 Vanderbilt) of the Company's indebtedness to Vanderbilt (it being understood that no such payment shall be made by the Company to Vanderbilt unless the Company shall, concurrently therewith, make the payment provided in this clause (C) to the holders of this issue of Debentures); provided that (I) no payment shall be made to the holders of this issue of Debentures pursuant to clause (A) of this subparagraph unless, at the time of such payment, the Company is not in default in the payment of interest on or principal of any indebtedness of the Company secured by mortgage; (II) the amounts referred to in clauses (B) and (C) of this subparagraph shall not be paid only out of available income; (III) the amounts referred to in clauses (B) and (C) of this subparagraph shall not be paid to the extent that such payment shall increase the ratio of current liabilities to current assets (as certified by the Company's independent accountants pursuant to clauses (C) and (D) of subparagraph (2)) above the ratio of two and a quarter (2 1/4) to one (1); and (IV) payments pursuant to clause (A), (B) and/or (C) of this subparagraph shall not be cumulative; and provided further that, in respect of the *324 calendar year 1955, the total payments due to the holders of this issue of Debentures pursuant to this subparagraph shall be prorated in accordance with the total number of days during which this issue of Debentures shall have been issued and outstanding in such year. (5) If no part of the Company's indebtedness to Vanderbilt is then outstanding, the Company shall pay, from time to time, on account of the principal amount then owing on this issue of Debentures such amounts as, in the opinion of the Board of Directors of the Company shall not be required by the Company, from time to time, as a reserve for operating expenses, capital improvements and taxes. (e) Subject to the provisions of paragraphs (c) and (d) hereof, if the Company (1) shall fail to make any payment of the principal amount of this issue of Debentures which shall become due in accordance with the applicable provision of paragraph (d) hereof, and such failure shall continue for a period of thirty (30) days, or (2) shall be adjudicated a bankrupt, or shall suffer a decree or order of a court of competent jurisdiction appointing a receiver or trustee of the Company or its property to be made, or shall suffer an order *325 approving a petition seeking statutory reorganization of the Company to be made, and any such decree or order shall not have been vacated or set aside within sixty (60) days from the date of the entry or granting thereof, or (3) shall institute proceedings for voluntary bankruptcy, or shall file a petition or answer seeking reorganization or an arrangement or a readjustment of its obligations under the Federal Bankruptcy Act or any other applicable law or statute of the United States or any state thereof, or shall make an assignment for the benefit of its creditors, or shall consent to the appointment of a receiver, trustee or liquidator of the Company, or (4) shall breach any of the provisions of paragraph (b) hereof, the entire unpaid principal amount hereof and accrued interest thereon shall become immediately due and payable. (f) This Debenture is one of a duly authorized issue of Debentures of the Company in registered form, designated as the Company's Ten Year 4% Debentures. (g) This Debenture is transferable by the registered holder hereof, in person or by attorney duly authorized in writing, at the office of the Company in Cleveland, Ohio, upon surrender of this Debenture *326 for cancellation; and upon any such transfer there will be issued to the transferee in exchange for the surrendered Debenture, at the Company's expense, a new registered Debenture or Debentures for the same aggregate principal amount. The Company may require payment of a sum sufficient to cover any stamp tax or other governmental charge that may be imposed in relation to any transfer of this Debenture. (h) Subject to the provisions of paragraphs (c) and (d) hereof, this Debenture and the other Debentures of this issue may be redeemed at the option of the Company at any time, upon not less than five (5) days' written notice to the registered owners thereof, in whole or in part, pro rata, at the office of the Company in Cleveland, Ohio, by payment of an amount equal to the principal amount to be redeemed, together with interest accrued thereon to the date fixed for redemption. (i) No recourse shall be had for the payment of the principal of, or interest on, this Debenture or for any claim based thereon, or otherwise in respect hereof, against any incorporator, stockholder, officer or director as such, past, present or future, of the Company, or of any successor corporation, whether *327 by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise, all such liability being by the acceptance hereof and as part of the consideration for the issue hereof expressly waived and released. (j)Subject to the provisions of paragraphs (c) and (d) hereof, the terms of the Debentures of this issue may be modified by the Company upon the written consents of the registered owners of not less than seventy-five percent (75%) in aggregate principal amount of this issue of Debentures at the time outstanding. During the taxable years 1955 through 1959, Hippodrome deducted the following amounts as interest on its Federal income tax returns in respect to its Debentures: 1955
$ 2,333.40
1956
13,577.59
1957
11,547.53
1958
10,149.56
1959
8,507.45
During the years 1956 through 1959, inclusive, Hippodrome made the following payments to the holders of its securities: Date
Designated by Hippodrome's records as payment of:
Amount
4/26/56
Debenture interest to 4/26/56
$ 7,000.00
4/26/56
Debenture principal - additional
8,712.72
10/26/56
Debenture interest to 10/26/56
6,825.75
10/26/56
Debenture principal - regular
28,500.00
12/17/56
Dividend on Class A & B Common Stock
200.00
3/29/57
Debenture principal - additional
25,798.44
4/26/57
Debenture interest to 4/26/57
6,169.73
10/26/57
Debenture principal - regular
28,500.00
10/26/57
Debenture interest to 10/26/57
5,739.78
12/18/57
Dividend on Class A & B Common Stock
200.00
4/ 4/58
Debenture interest to 4/26/58
5,169.78
10/26/58
Debenture principal - regular
28,500.00
10/26/58
Debenture interest to 10/26/58
5,169.78
12/23/58
Dividend on Class A & B Common Stock
200.00
3/ 2/59
Dividend on Class A Common Stock
6,250.00
4/26/59
Debenture interest to 4/26/59
4,599.78
6/30/59
Dividend on Class A Common Stock
18,750.00
9/ 9/59
Debenture principal - additional
43,037.56
10/28/59
Debenture principal - regular
28,500.00
*328 During the year 1957, petitioner Edwin I. Bamberger received the following payments from Hippodrome: Designated by Hippodrome
on its records as
Date
Amount
payment of
3/29/57
$1,842.75
Additional payment of prin-
cipal based on earnings
4/26/57
440.68
Interest to 4/26/57
10/26/57
409.99
Interest to 10/26/57
10/26/57
2,035.72
Regular annual payment of
principal
12/18/57
5.00
Dividend on Class A Com-
mon Stock On their joint Federal income tax return for the taxable year 1957 petitioners Edwin I. and Rita Bamberger included as interest income the amount of $850.67, representing the sums designated above as "Interest." While they reported as dividend income the $5.00 received as a dividend on the Class A Common stock, they did not report the remaining amounts, or $3,878.47, designated above as "Payment of Principal." In his notice of deficiency in docket No. 95333 respondent disallowed to Hippodrome the amounts claimed by it during the taxable years 1955 through 1959 as interest paid to its debenture holders on the ground that said debentures were "in the nature of capital contributions rather than evidences of indebtedness"and, *329 therefore, amounts claimed as interest paid in respect to them were "not properly deductible under the provisions of section 163, or any other section of the Internal Revenue Code of 1954." Concomitantly, in his notice of deficiency in docket No. 95334, respondent treated as dividends the amounts which were paid by Hippodrome during the taxable year 1957 to Edwin I. Bamberger in respect to the Hippodrome debentures held by him. Opinion Section 163(a), Internal Revenue Code of 1954, permits a deduction for all the interest paid or accrued within the taxable year on "indebtedness," and it is axiomatic that repayments of the principal of such an "indebtedness" do not constitute taxable income to the recipients thereof. The issue, then, is whether the debentures which form the controverted subject matter of the instant proceeding represent a bona fide "indebtedness," as contended by petitioners, or whether, as maintained by respondent, they manifest merely a proprietary equity on the part of the holders. The question is by no means one of first impression, and it is clear that its resolution must be had by resort to all the facts rather than merely to the formalities *330 chosen to be observed by the parties. Proctor Shop, Inc., 30 B.T.A. 721 (1934), affd. 82 F. 2d 792 (C.A. 9, 1936); Gooding Amusement Co., 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956); Colony, Inc., 26 T.C. 30 (1956), affd. 244 F. 2d 75 (C.A. 6, 1957), reversed on other grounds 357 U.S. 28 (1958). As a first proposition, we note that debentures identical with those here in controversy, and which were held by two other members of the Babin group, were recently construed in the case of Fellinger, et al. v. United States, 238 F. Supp. 67 (N.D. Ohio, 1964). After an exhaustive legal analysis employing all of the well-known objective criteria for making determinations of this nature, [1]the District Court concluded that no bona fide indebtedness existed between the plaintiffs, Herold Fellinger and Maurice Bernstein, and Hippodrome, and that the Hippdrome debentures under scrutiny represented no more than an equity investment on their part in the company. We agree with this conclusion.
*331 Aside from the obvious compulsion of the doctrine of stare decisis, an independent analysis of all the evidence presented in the instant proceeding compels a similar finding here. It is clear to us that what Babin and the group which he represented were negotiating for, and what they were successful in achieving as a necessary concomitant to their advance of $350,000, was an equity interest in Hippodrome. Scheftel, who had for two years prior thereto attempted unsuccessfully to obtain the money through normal commercial channels, deposed that only upon the inducement of an equity interest were Babin and his group willing to advance the needed funds. Babin himself testified that in the absence of an opportunity to obtain an equity interest (or an undisclosed "something else of equal value") the advance to Hippodrome would not have been made. And, in the proposal offering an opportunity to participate in the venture, it is stated that "what makes the deal attractive" is the fact that an equity interest could be acquired as consideration for the advance. It is also clear to us that the purpose for which the funds supplied by the Babin group were to be used was to replace the equity *332 capital being withdrawn from the corporation by the retiring Vanderbilt. At the trial of this cause, Anthony Babin, an officer of Hippodrome, custodian of its books and records, and a person familiar with the transactions pursuant to which its debentures were issued, was asked the following question: Now, assume that these $350,000 in socalled debentures were never advanced and that consequently you have $350,000 less in current assets at the end of December 31, 1955, and further that there were no outstanding liabilities for these debentures, would Hippodrome have had sufficient capital? His reply: Not after concluding its transaction with Mr. Vanderbilt. And upon deposition, Stuart Scheftel, in answer to the following question: Was it your belief * * * that the corporation would not have had sufficient working capital to carry on the business * * * without the sum of $350,000 being paid in? deposed: My position was that it was a question of life and death to the corporation, to borrow that money, because without it I couldn't satisfy Vanderbilt * * * [or] carry on with the company. Thus, although Hippodrome was an established corporation (as distinguished from a *333 new enterprise), it is obvious that the funds supplied by the Babin group did not constitute an addition to adequately existing operating capital, but represented, instead, an advance of necessary working capital without which the corporation would not have been able to continue. Such a situation closely parallels that under which an investment of equity capital is made in a new venture, particularly where, as here, the evidence indicates that the corporation was unable to borrow the necessary funds through normal commercial channels. Another factor which denigrates the standing of Hippodrome's debentures as debt is their demonstrably subordinate position with respect to the other principal indebtedness of the corporation. Not only were they subordinate to the indebtedness owed the Connecticut General Life Insurance Company, but they were also subordinate to the note due Vanderbilt, whereas the liabilities to which they were not subordinate appear to have been negligible in amount as compared with the $350,000 in question. Cf. Colony, Inc., supra.Moreover, although it is true that the terms of the debentures provide for the payment of interest at 4 percent annually, *334 and that in the event of nonpayment thereof within 30 days of the due date the entire principal could be declared in default, the right to declare such a default is by no means an absolute one since the registered owners "of not less than seventy-five percent (75%) in aggregate principal amount of this issue of Debentures" must agree on declaration of a default. While this provision, standing alone, would not destroy the status of Hippodrome's debentures as debt, its coupling with the language of paragraph (j), providing that the terms of the debentures may be modified by the Company upon the written consents of 75 percent in amount of the debenture holders, gives to such holders rights normally enjoyed only by common stockholders. R. C. Owen Company v. United States, 180 F. Supp. 369 (Ct. Cl., 1960), certiorari denied 363 U.S. 819 (1960). Certainly the existence of provisions in a purported debt instrument which grant such substantial rights casts a serious doubt as to whether the holder thereof is in fact a creditor of the issuing corporation. In addition to the analysis set forth above, we have carefully considered all of the authorities urged by both *335 parties. Our ultimate conclusion, drawn from a consideration of all the facts as well as these authorities, is that the instruments issued by the Hippodrome Building Company, and designated as debentures, do not represent a bona fide indebtedness on the part of the company. Accordingly, Decisions will be entered for the respondent. Footnotes
1. See, for example, O. H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123, 125 (C.A. 9, 1960); Gilbert v. Commissioner, 248 F. 2d 399, 406↩ (C.A. 2, 1957).