THE GREGG COMPANY OF DELAWARE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 46472.    Filed October 29, 1954.

*William W. Owens, Esq.,* and *Loren C. Berry, Esq.,* for the petitioner.

*Richard G. Maloney, Esq.,* and *Ellyne E. Strickland, Esq.,* for the respondent.

OPINION.

MURDOCK, *Judge:* The Commissioner determined deficiencies and additions under section 291 (a) of the Internal Revenue Code of 1939 as follows:

| Year | Income tax | | Excess profits tax | | Declared value excess-profits tax | |
|---|---|---|---|---|---|---|
| | Deficiency | Addition | Deficiency | Addition | Deficiency | Addition |
| 1935 | $5,437.15 | $1,359.29 | $1,977.15 | $494.29 | | |
| 1936 | 4,796.37 | 1,199.09 | 4,759.73 | 1,189.93 | | |
| 1937 | 4,822.96 | 1,205.74 | 4,784.27 | 1,196.07 | | |
| 1938 | 6,581.00 | 1,645.25 | 4,786.18 | 1,196.55 | | |
| 1939 | 6,559.99 | 1,640.00 | | | $4,770.90 | $1,192.73 |
| 1940 | 4,964.68 | 1,241.17 | | | 3,254.47 | 813.62 |
| 1941 | 6,682.72 | 1,670.68 | | | 3,579.81 | 894.95 |
| 1942 | 7,873.87 | 1,968.47 | | | 3,579.91 | 894.98 |
| 1943 | 7,813.71 | 1,953.43 | | | 3,564.92 | 891.23 |
| 1944 | 7,816.10 | 1,954.03 | | | 3,565.52 | 891.38 |
| 1947 | 6,874.66 | 1,718.67 | | | | |
| 1948 | 6,875.72 | 1,718.93 | | | | |
| 1949 | 5,840.95 | | | | | |

The only issue for decision is whether amounts which the petitioner paid out during the taxable years were payments of interest deductible under section 23 (b). The petitioner is not contesting the additions under section 291 (a) if the amounts in controversy were not deductible as interest. Substantially all of the material facts were stipulated and the stipulation is adopted as a part of the findings of fact. All numbered paragraphs herein represent additional findings of fact.

Returns for the taxable years were filed late with the collector of internal revenue for the second district of New York.

1. Those returns were not filed within the time prescribed by law and the failure to file the returns within the time prescribed by law was not due to reasonable cause but was due to willful neglect.

The Gregg Company, Limited, hereafter called New York, was organized as a New York corporation in 1903 and was engaged in the business of building and selling railway cars and equipment in various parts of the world, largely in Latin America, up to 1933. All but 630 of the 18,903 outstanding shares of its stock were owned by members of the Gregg family.

William C. Gregg organized a Belgian corporation, Société Gregg d'Europe, hereafter called Belgian, in 1927. He subscribed for 1,990 shares of its authorized capital stock of 2,000 shares and within the next 2 years transferred 1,984 of those shares to New York, 3 to Louis D. Gregg, and retained 3 in his own name. The capital stock of Belgian was increased to 10,000 shares in 1929.

2. Belgian engaged in manufacturing and received from New York about the equivalent of its cost of manufacturing. New York owned the goods in process, finished goods, and the inventory of the business conducted by Belgian. New York sold the goods manufactured by Belgian and had entire control of the merchandise and the operations of Belgian.

3. The common stockholders of New York decided to make changes in 1933 for the purpose of avoiding income taxes on New York for foreign profits and to give recognition to the fact that the business was entirely outside the United States. Representatives of New York consulted a "tax expert" of an accounting firm in 1933 who drew up a plan and then they consulted a lawyer who approved the plan and guided them in the steps taken to carry it out.

The par value of the common shares of New York was reduced from $100 to $5 on October 16, 1933. The petitioner was organized under the laws of Delaware on October 18, 1933, and all of the assets of New York relating to its foreign operations were transferred to the petitioner on October 31, 1933, in exchange for all of its stock, 2,000 shares of no-par common, and $1,000,000 face value of its Fifty-Year 4% Income Notes. The notes of the petitioner were immediately distributed by New York pro rata to its stockholders.

4. There was never any intention that the petitioner would engage in business. The assets transferred by New York to the petitioner had a value at the time of transfer of at least $1,318,000. New York retained assets of undisclosed value.

A new corporation, herein called Panama, was organized under the laws of Panama on October 24, 1933, and the petitioner transferred to Panama on or about October 31, 1933, all of the assets, with the exception of $2,000, which it had just received from New York. Pan-

ama, in consideration of the transfer of those assets to it, issued to the petitioner 10,000 shares of its 4 per cent noncumulative $100 par value voting preferred stock.

Some employees of New York had been allowed to purchase about $35,000 par value of its participating preferred stock. That preferred stock was called for redemption on September 26, 1933. The employees were given the right to subscribe for similar stock of Panama and they did subscribe to the extent of $30,100. That stock was retired in 1939.

Each common stockholder of New York subscribed for the same number of shares of the common stock of Panama as the number of shares of New York common held by him and paid for them at 10 cents a share.

5. Panama took over the operation of the foreign business, using Belgian as the manufacturing corporation.

The notes issued by the petitioner were entitled "Fifty-Year 4% Income Notes." The principal was payable February 1, 1984, and the petitioner agreed to pay interest from the 1st of January 1934 at a rate not to exceed 4 per cent per annum beginning February 1, 1935, and on the 1st of February in each year thereafter "out of the surplus net earnings and income for the preceding calendar year but only if and to the extent that the surplus net earnings and income of the Company shall suffice for such payment; such interest shall not be cumulative and no part of the interest hereon for the payment of which the surplus net earnings and income for any interest year shall be insufficient shall be a charge upon or shall be paid from the income of any other year." The notes were of equal rank. There was a provision in each note that current expenses of the business, taxes, insurance charges, other interest charges, and such sums as the board of directors in their discretion might set aside as a reserve for any proper purpose or contingency were to be deducted from the gross earnings for the interest period in determining the surplus net earnings and income applicable to the payment of interest on the Fifty-Year 4% Income Notes. The amounts available up to 4 per cent were to be paid promptly "unless in the judgment of the Board of Directors, the net quick asset position of the Company shall render it undesirable to make such payment," but any earned interest thus withheld was to accumulate and was to be payable without interest thereafter when the board might determine and was to become payable at maturity if not paid prior thereto. The determination of the board of directors as to the surplus net earnings and income applicable to the payment of interest on the notes was to be final and conclusive. Each note was subject to redemption in whole or in part at any time prior to maturity upon call, together with accrued and unpaid interest for the current year, whether earned or not, after written notice of 10 days.

The notes were to become due and payable immediately in the event of liquidation and dissolution whether voluntary or involuntary, or if the company was adjudicated a bankrupt or insolvent. The notes were transferable. The noteholders were to have no recourse for the payment of principal or interest against any stockholder, officer, or director of the company. The notes contained no provision subordinating the payment of principal on them to the claims of general creditors, they were not secured, and they had no voting privileges.

Panama paid the petitioner $40,000 in 1935 as the first dividend on the preferred stock and made like payments in each year through 1939. The petitioner paid out all of that money as received to the holders of its Fifty-Year 4% Income Notes.

$319,100 par value of the petitioner's Fifty-Year 4% Income Notes was retired in 1939 at par for cash and Panama retired an equal amount of its preferred stock. This was a result of the sale by Louis D. Gregg and members of his family of all of their interests in the Gregg companies. Thereafter, for each of the years 1940 through 1949, except 1945 and 1946, Panama paid to the petitioner as dividends on preferred stock $27,236. It made no payments for the years 1945 and 1946. The petitioner paid to the holders of its Fifty-Year 4% Income Notes $27,233.76 for each of the years 1940 through 1944, made no payments for 1945 and 1946, and paid $27,233.77 to the noteholders for the years 1947 through 1949.

William Burr Gregg, the only witness called for the purpose, was asked why the petitioner issued notes instead of preferred stock. His answer was:

There were several reasons. One was that we expected to give by bequest certain amounts to members of our families and my sisters who were large stockholders had the same intention, and my brother and I, for instance, gave to our wives and two children respectively, and my sisters did something in a similar way, and we figured that a debenture would have a little more value to them in the sense that a debenture sounds better than a preferred stock and that after a little seasoning in the record it is a little better and, furthermore, the debenture is payable on a definite date, a definite due date, which preferred stock is not.

And then our reason for having the debentures—further reason—we didn't want to have votes given to these miscellaneous holders who had received the securities by gift because a lot of them were unknown or uncertain.

We could not tell who our sons and daughters would marry; but in the case of my sister, one of my sisters was living in England and she gave it to her children who were British subjects, one of whom I had never even met.

In another case it was put in trust because he was a minor. We did not want voting stock kicking around with a lot of people that had nothing to do with management of the company. That was my brother and myself who decided that because we had control and didn't want any—

The parties in their briefs have discussed the detailed provisions contained in the Fifty-Year 4% Income Notes and their discussion

raises the question of whether under those provisions the amounts here in question were deductible as interest. Cf. *1432 Broadway Corporation*, 4 T. C. 1158, affd. 160 F. 2d 885; *Swoby Corporation*, 9 T. C. 887. The case could be decided properly in that way if these were notes of an ordinary independent company and if the various arrangements made by the New York common stockholders, to which reference has been made, were not inseparable parts of the whole transaction. However, it is appropriate to examine the entire plan and all of the results which it brought about in deciding the question and there is no point in discussing, for example, the rights of the holders of these so-called notes in relation to the rights of general creditors of the petitioner which conducted no business and had no creditors except as the United States Government may be a creditor as a result of the nonpayment of income taxes, and likewise there is no point in discussing the maturity date of the notes without taking into consideration the source of payment of the principal. The cases cited by the parties do not present a situation like the present one in which the petitioner and its alleged notes are inextricably a part of the whole transaction and made to depend entirely upon the preferred stock of Panama.

The common stockholders of New York, for the most part the Gregg family, adopted the plan. Their relative interests in the business were not changed by the various steps taken. Cf. *Edward G. Janeway*, 2 T. C. 197, affd. 147 F. 2d 602; *1432 Broadway Corporation, supra*. Their general purpose was to have Panama take the place of New York in the operation of the foreign business so that the income from that business would not be subject to United States corporation income taxes. They believed that a direct transfer of the foreign business assets to a foreign corporation in exchange for its securities would result in income tax on themselves.[1] The petitioner was created and used so that the assets could go through it to the foreign corporation and the stockholders of New York could receive securities of the petitioner in a tax-free reorganization. Then its notes were used with the thought that its payment of the so-called interest would relieve it from income taxes. It was a mere conduit to receive dividends on the 4 per cent preferred stock of Panama, which it was allowed to own, and to distribute those same amounts to the holders of its so-called Fifty-Year 4% Income Notes. It had no other source of

---

[1] Section 112 (k) of the Revenue Act of 1932 provided :

(k) FOREIGN CORPORATIONS.—In determining the extent to which gain shall be recognized in the case of any of the exchanges or distributions (made after the date of the enactment of this Act) described in subsection (b) (3), (4), or (5), or described in so much of subsection (c) as refers to subsection (b) (3) or (5), or described in subsection (d) or (g), a foreign corporation shall not be considered as a corporation unless, prior to such exchange or distribution, it has been established to the satisfaction of the Commissioner that such exchange or distribution is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.

income and no means of paying the principal of the notes except from the retirement of the preferred stock of Panama. It was to receive, if earned by Panama, not more than 4 per cent on the preferred stock annually. Those dividends were not cumulative and their payment depended to some extent upon the discretion of Panama's directors. Excess earnings of one year could not be used to pay the 4 per cent dividends for another year for which the earnings were insufficient. Actually no amounts were ever paid for 1945 and 1946.

The total amount paid by the stockholders of New York for the common stock of Panama was $1,890.30. Employees paid an additional $30,100 for participating preferred stock of Panama. Assets having a book value of $1,767,676.54 and a fair market value of about $1,318,000 were transferred to Panama in exchange for $1,000,000 par value of its preferred stock. Those assets represented capital of New York at the risk of and essential to the business while conducted by it. They were transferred, pursuant to a prearranged integral plan, to the petitioner and then immediately on to Panama where they represented capital at the risk of and essential to the business carried on by it. Cf. *1432 Broadway Corporation, supra.* Appropriately stock, rather than evidence of indebtedness, was issued by Panama for those assets. They remained without interruption at the risk of the business, that is, the over-all business carried on by the Gregg corporations. If the Panama preferred stock had been channeled into the hands of the New York common stockholders, the amounts here in question, or substantially those amounts, would have been received by them as dividends on preferred stock of Panama. The petitioner now claims that the assets of the foreign business, while in its name, suddenly changed from risk capital into borrowed funds although they immediately changed back again into risk capital when they were transferred to Panama, and it claims that the same earnings, which left Panama as a distribution of earnings of its business payable on preferred stock, changed character and became interest on indebtedness deductible under section 23 (b) when paid out by the petitioner. No such alchemy should be recognized for income tax purposes in these arrangements designed primarily for the purpose of avoiding income taxes. The petitioner did not borrow from the New York stockholders. There is no substance to support the alleged indebtedness of the petitioner.

The conclusion has been reached, after carefully considering all of the evidence in the case, that the amounts in question were not deductible as interest under section 23 (b). It follows that the determinations of the Commissioner, both as to tax and additions thereto, must be sustained.

*Decision will be entered for the respondent.*