MONON RAILROAD (FORMERLY CHICAGO, INDIANAPOLIS AND LOUISVILLE RAILWAY COMPANY), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5589–65. Filed November 25, 1970.

*Charles F. Marquis* and *Arthur I. Gould*, for the petitioner.
*Nelson E. Shafer*, for the respondent.

SIMPSON, *Judge:* The respondent determined deficiencies in the income tax of the petitioner as follows:

| TYE. Dec. 31— | Deficiency |
|---|---|
| 1953 | $10,701.85 |
| 1954 | 78,943.98 |
| 1955 | 387,851.04 |
| 1956 | 325,324.92 |

The respondent also redetermined the petitioner's income for the taxable years ended December 31, 1957, December 31, 1958, and December 31, 1959. In each of these 3 years, the petitioner incurred a loss according to both its income tax return and the respondent's statement of adjustment; however, the respondent's redeterminations for such years affected the net operating loss carryback available for the earlier years for which deficiencies were determined. The only issue remaining for decision, after concessions by both parties, is whether the petitioner may deduct, as interest, amounts paid or accrued in 1958 and 1959 with respect to certain 6-percent income debentures issued by the petitioner in 1958. We must decide: (1) Whether the so-called income debentures constitute a debt obligation or a form of equity, and (2) if they are debt obligations, whether the petitioner can deduct that portion of the so-called "interest" paid with respect to the 15-month period prior to the issuance of the debentures.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Monon Railroad, is an Indiana corporation which had its principal place of business in Chicago, Ill., at the time the petition was filed in this case. It filed its Federal income tax returns for the taxable years 1953 through 1959, using the accrual method of accounting, with the district director of internal revenue, Chicago, Ill.

The petitioner, which was organized in 1897, is a publicly held corporation, whose stock is listed on the New York and Midwest Stock Exchanges. It is engaged in the business of operating as a common carrier by rail in interstate commerce, and is subject to the jurisdiction of the Interstate Commerce Commission.

In 1933, the petitioner instituted proceedings in the U.S. District

Court for the Northern District of Illinois, Eastern Division, for a reorganization under section 77 of the Bankruptcy Act. In 1945 and 1946, that court approved and confirmed a plan of reorganization pursuant to such section for the petitioner. The plan was effective as of January 1, 1943.

The new capitalization of the petitioner, pursuant to the plan of reorganization, was as follows:

| | |
|---|---:|
| Equipment-trust obligations (unchanged from previously) | $70,000 |
| First-mortgage series A 4-percent income bonds | 7,613,800 |
| Second-mortgage series A 4½-percent income bonds | 8,914,496 |
| Class A 5-percent common stock, $25 par value, 343,713.80 shares | 8,592,845 |
| Class B common stock, no-par value, stated value of $25 per share, 195,746 shares | 4,893,650 |
| Total | 30,084,791 |

The petitioner was required to pay interest on the first- and second-mortgage income bonds for any particular year to the extent of "available net income" for that year, as that term was defined in the indenture. Interest for a year was payable on April 1 of the following year. Lacking available net income, the petitioner was authorized to pay interest on the bonds out of any funds lawfully available therefor, providing that all prior obligations were satisfied. Such optional payments were at the discretion of the board of directors. The first-mortgage bonds were to mature in 1983; the second-mortgage bonds in 2003. Interest on the first-mortgage income bonds was fully cumulative to the extent not paid whether or not earned; unpaid interest on the second-mortgage income bonds could accumulate only to 13½ percent. Unpaid accumulated interest with respect to a prior year or years was required to be paid in the event there was available net income in a subsequent year. On both types of bonds, accumulated interest was payable at the same time as principal. When accumulated unpaid interest reached 12 percent of the principal with respect to the first-mortgage bonds, or 13½ percent of the principal with respect to the second-mortgage bonds, the holders of that series of bonds were given the right to nominate three members of the board of directors, who were to be elected by class A shareholders. This right was to continue until the accumulated interest was paid. A noncumulative sinking fund was provided for the retirement of each class of income bonds. The first- and second-mortgage income bonds were secured by first and second liens, respectively, on almost all property owned by the petitioner.

Holders of both class A and class B stock were entitled to receive cash dividend payments, when and if declared. Class A stock was entitled to dividends of $1.25 per share per year before any dividends were paid or declared on the class B stock. After dividends of like

amounts were paid on class B stock, class A and class B stock were to share equally in any further dividend distributions that year. Dividends on the class A stock were cumulative up to $1.25 per share to the extent earned in any calendar year but not paid. In the event of liquidation, the Class A shareholders were entitled to receive $25 per share, plus accrued but unpaid dividends, before any distribution was to be made to the class B shareholders, but were not entitled to any further participation in the assets.

The petitioner's board of directors consisted of 11 members. The plan of reorganization provided that, other than in exceptional circumstances not here relevant, 8 of the directors were to be elected by the combined vote of class A and class B shareholders, each share having one vote; and that the class B shareholders, voting as a class, were entitled to elect the other 3 directors. On all other matters, holders of class A and B stock were entitled to one vote per share.

The prebankruptcy shareholders received no interest in the petitioner under the bankruptcy plan of reorganization. The class A and class B stock was issued to the former creditors of the petitioner, with the class A stock (which carried voting control) allocated principally to those who were senior creditors prior to the reorganization.

Pursuant to the plan of reorganization approved by the District Court, all of the shares of class A and class B stock were subject to a trust from 1946 to 1956. The voting rights to such stock were granted to three designated trustees, and trust certificates were issued to persons otherwise entitled to receive the stock. The trustees were authorized to sell up to 50 percent of the class A stock and not less than 50 percent of the class B stock, and to purchase for retirement part or all of the class A stock. The purpose of the trust was to provide a mechanism whereby, it was hoped, a successful railroad company or system could acquire a controlling stock interest in the petitioner. Efforts were made during the trusteeship toward this end, but to no avail. The stock trust agreement terminated on January 10, 1956, and at that time, the holders of the trust certificates received stock in exchange therefor.

As early as 1943, the ICC saw the advisability of the retirement of the class A common stock, to the extent that the petitioner's financial condition would permit. It believed that the retirement of the class A stock would expedite the desired acquisition of a controlling stock interest in the petitioner by another railroad. The ICC empowered the trustees to propose to the purchasers of the trusteed stock that the reorganized company (the petitioner) purchase and retire part or all of the class A stock, or that a certain percentage of future earnings be employed toward the eventual purchase and retirement of such stock.

At the meeting of the petitioner's board of directors on November

10, 1954, the chairman of the board stated that the suggestion of converting class A stock to debentures had been under consideration, and that although such a conversion would be advantageous, he suggested that action on it be postponed until after the termination of the stock trust agreement. At the meeting of the board on April 11, 1956, the directors approved a suggestion that the possibilities of such a conversion, or any other possible recapitalization plan, be explored with the ICC. At subsequent meetings of the petitioner's board of directors, and the executive committee thereof, in 1956 and 1957, there was additional discussion of the recapitalization to be effected by the exchange of debentures for class A stock.

At the meeting of December 12, 1956, it was suggested that the petitioner effect the retirement and cancellation of the class A stock by repurchasing it on the open market, although questions were raised as to whether the company's cash position was conducive to such a plan. Later, it became more apparent that the repurchase of stock was not workable due to lack of available cash.

In February 1957, the board of directors voted to approve a plan, favored by the executive committee, for reacquiring the class A stock. Under this plan, for each share of class A stock, the petitioner would offer a new 50-year 6-percent income debenture in the principal amount of $25, plus one-half share of class B common stock. It was believed necessary to provide a 6-percent rate of interest and to include the offer of the class B stock to induce a substantial participation in the exchange by owners of the class A stock, since the offer was to be made available to them on a voluntary basis. In March 1957, the petitioner's stockholders adopted a resolution to increase the number of authorized shares of class B stock from 195,746 to 500,000.

In May 1957, the board of directors authorized an exchange offer in accordance with the plan approved by them to be mailed to the holders of the class A stock, with the effectiveness of the offer to be conditioned upon its acceptance by December 31, 1957, of either 75 percent of the outstanding class A stock or of such lesser percentage of the stock as company officials determined in their discretion. The corporate officials were also authorized to extend the period of the offer in their discretion. In fact, the deadline was later extended to March 31, 1958.

Certain of the petitioner's directors and executives were authorized to make application to the ICC for the authority to issue the new 6-percent income debentures and additional shares of class B stock, and to effect the exchange. Such application was filed in May 1957. With respect to the purposes and advantages of the proposed plan, the petitioner represented the following to the ICC:

(1) That, by retiring its class A common stock, it could simplify its capital structure and strenghten its equity securities;

(2) That its articles of association, which were submitted to the ICC in connection with the reorganization proceedings, had contemplated the retirement of the class A stock;

(3) That the retirement of the class A stock would eliminate the need for the unusual method of voting for directors;

(4) That the retirement of the class A stock would simplify dividend requirements;

(5) That the debentures would yield tax benefits, to replace amortization deductions which were then running out; and

(6) That the retirement of the class A stock would afford the only basis upon which the B stock could receive a dividend in the foreseeable future—the class B stock not having received a dividend since the time of the reorganization.

Moreover, the petitioner pointed out that the elimination of the class A stock would improve the voting position of the class B stockholders by giving them, as such, control over the corporation, which had theretofore been in the hands of the class A shareholders by virtue of the greater number of shares they held. It indicated that this improved voting position, along with the improved prospect for dividends on class B stock, would improve the marketability of such stock and the stability of its value, make the class B stock a less speculative investment, and promote investor confidence.

In stressing the idea that the exchange was intended as a very substantial step toward the elimination of the class A stock, the petitioner stated to the ICC that in the event that less than 100 percent of such stock is exchanged under the offer, it expected that the remaining shares could be redeemed from the cash savings realizable as a result of the exchange, and from other funds. To illustrate that the prospect of payment of dividends on the class B stock seemed bleak as long as the class A stock was in existence, the petitioner pointed out to the ICC that there were accumulated unpaid dividends on the class A stock in the amount of $3.53 per share as of January 1, 1957; and no dividends could be paid on the class B stock until after the class A shares had been paid $1.25 with respect to the most recent year in addition to all accumulated unpaid dividends.

The ICC granted the petitioner the authority it had requested. The ICC noted in its report that although no security was provided for the payment of the debentures, they do constitute a "direct obligation of the applicant." It stated that the petitioner's proposed exchange appears to be fair to both class A and class B stockholders.

The petitioner invited its class A shareholders to participate in the exchange offer by letter dated January 31, 1958. The letter noted that

as of January 1, 1958, the accumulated and unpaid dividends on the class A stock stood at $2.31 per share. Among the benefits of the exchange mentioned to the class A shareholders were that taxes could be saved by deducting the interest on the debentures, that the interest would be payable to the extent earned, that the unpaid interest would accumulate to 12 percent, and that accumulated interest would be payable when earned; whereas, dividends on the class A stock were not payable unless declared. It was also pointed out that the debentures "would be a debt obligation of the Corporation, a promise to pay a sum certain at a definite maturity date," and that the debentures would have the benefit of a noncumulative sinking fund; whereas, there is no provision for a sinking fund on class A and class B stock. The class A shareholders were reminded that they would continue to be shareholders if they accepted the offer, because of the class B stock they would receive. They were advised that if the class A stock could be retired, the corporation's capital structure would thereby be simplified, and its financial position strengthened. The letter stated that the board of directors had not decided whether it would call for redemption of those shares of class A stock not surrendered pursuant to the exchange offer; but it revealed the corporate intention to retire all shares of class A stock exchanged. It stated that the proposed debenture indenture gives the trustee "any remedy normally available to creditors" in the case of the petitioner's default by failing to make payments of principal and interest when and as due. It said that holders of the debentures would not be entitled to vote; whereas, holders of both classes of stock are each entitled to one vote per share on all matters, except for the election of directors. It pointed out that the class A shareholders would lose control if they participated fully in the exchange: instead of controlling about 63 percent of the votes (331,042 votes out of about 525,614), they would control only about 46 percent (165,521 votes out of about 360,093). The letter also pointed out the voluntary nature of the exchange. It advised the class A shareholders that, in the opinion of the petitioner's counsel, the exchange of their stock for income debentures plus class B stock would constitute a transaction on which they would be taxable under section 354(a)(2)(B) of the Internal Revenue Code of 1954.[1]

In a subsequent letter, the petitioner notified its class A shareholders that, assuming the offer became effective by March 31, 1958, those who accepted by that date would receive debentures dated January 1, 1957. On such debentures, interest would be paid at the usual rate of 6 percent with respect to the period beginning January 1, 1957; the interest for 1957 would be paid on April 1, 1958. The payment of

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.

interest for a 15-month period prior to the actual issuance of the debentures was intended to act as an added inducement to the holders of the class A stock to participate in the exchange.

The petitioner had 1,218 shareholders of record as of December 31, 1956, and 1,191, as of December 31, 1957.

The last board of directors meeting held before the March 31 deadline was held on March 19, 1958. As of the close of business the previous day, about 68 percent of the outstanding class A stock had been tendered for exchange. Although such offers were insufficient to make the plan effective automatically, the directors declared that it would be effective as of March 31. In so doing, they followed a recommendation made by the shareholders at their annual meeting the same day. The directors also confirmed a previous resolution that the 6-percent interest should be paid with respect to the year 1957 despite the fact that "Available Net Income" as defined in the debenture indenture was not earned by the petitioner in 1957.

By March 31, 1958, a total of 290,731 out of the 331,042 shares of class A stock outstanding (nearly 88 percent) were tendered for exchange. After such exchange was completed, the approximate number of shares of stock issued and still outstanding was:

|  | Shares |
|---|---|
| Class A stock | 40, 311 |
| Class B stock | 341, 111½ |
|  | 381, 422½ |

Subsequent to the deadline, but prior to July 16, 1958, the petitioner accepted an additional 450 shares of class A stock that had been tendered for exchange. The exchange of these additional shares brought the principal amount of 6-percent income debentures issued to $7,279,525. The interest deductions claimed by the petitioner in the years here in issue are based on 6 percent of this latter figure, or $436,771.50 per year. All of the class A stock that was surrendered pursuant to the exchange offer was canceled and retired.

The indenture agreement for the debentures was executed on March 28, 1958, dated as of January 1, 1957, with the other terms conforming to the plans. The Manufacturers Trust Co. was designated as trustee. The interest for each year was made payable on April 1 of the following year. The payments were to be made out of available net income as defined in the indenture, and were made subordinate to payments of interest on the first- and second-mortgage income bonds. The interest on the debentures was mandatorily payable to the extent of available net income remaining for that purpose. In the event of the petitioner's default, either the trustee under the indenture or the holders of at least 25 percent of the aggregate principal amount of

the outstanding debentures could declare the principal of all outstanding debentures to be due and payable immediately.

Available net income was to be determined for each calendar year, from 1957 on, within 2 months after the termination thereof. It consisted basically of "income after fixed charges" as determined under ICC accounting rules and sound accounting practice. The available net income for each calendar year was to be applied, on April 1 of the following year, in the following order:

(1) Payment of accrued contingent interest on first-mortgage bonds;

(2) Payment to the sinking fund for the benefit of the first-mortgage bonds;

(3) Payment to the Additions and Betterments Fund established with respect to the first and second mortgages;

(4) Payment of accumulated accrued and unpaid interest for prior years on first-mortgage bonds;

(5) Payment of contingent interest, and any accumulations thereof, on second-mortgage bonds;

(6) Payment to the sinking fund for the benefit of the second-mortgage bonds;

(7) Payment of contingent interest, and any accumulations thereof, on the 6-percent income debentures;

(8) Payment to the sinking fund for the benefit of the income debentures; and

(9) Use for general corporate purposes or for dividends on the stock, and for payments to the second-mortgage sinking fund to the extent of 25 percent of the dividends paid on the stock.

The petitioner could, at the discretion of its board of directors, pay any accrued unpaid interest on any April 1, even if not then mandatorily payable, and even if there was no available net income from which to make such a payment. Such payment could be made from any funds lawfully available therefor. The debentures were redeemable at any time at the petitioner's option, and a noncumulative sinking fund was provided for their retirement.

By application dated March 25, 1958, the petitioner applied to the Securities and Exchange Commission for the registration of its 6-percent income debentures pursuant to the Securities Exchange Act of 1934. The New York Stock Exchange had authorized the listing thereon of the petitoner's new 6-percent income debentures and the additional shares of class B stock, in response to the petitioner's application dated January 22, 1958. The application included the opinion of the petitioner's counsel that the debentures are "valid and binding obligations of the Company." The 6-percent income debentures have been traded on the New York Stock Exchange as bonds since 1958.

At the close of 1958, the petitioner's funded debt, including the new debentures, totaled $19,542,925; its total equity, including capital stock, retained income, and capital surplus, was $18,070,324.

In its 1958 Federal income tax return, the petitioner claimed the following interest deductions with respect to its 6-percent income debentures:

| | |
|---|---:|
| Preissue interest for 1957, paid in 1958 | $436,771.50 |
| Preissue interest accrued for period 1/1/58–3/31/58 | 109,192.88 |
| Total preissue interest | 545,964.38 |
| Interest accrued for period 4/1/58–12/31/58 | 327,579.00 |
| Total | 873,543.38 |

The petitioner's available net income for 1958, as defined in the income debenture indenture, was not sufficient to pay any of the interest with respect to 1958 on the debentures; nevertheless, all of the interest accrued with respect to 1958 was paid on April 1, 1959. The board of directors resolved to pay such interest, believing that such payment was in the best interests of the company.

In its 1959 Federal income tax return, the petitioner claimed a deduction of $436,772 for interest accrued on the 6-percent income debentures for 1959. The petitioner's available net income for 1959 was not sufficient to pay interest on the debentures, but, pursuant to a resolution by the board of directors, one-half of such accrued interest was paid on April 1, 1960.

In its 1960 Federal income tax return, the petitioner claimed a deduction of $436,772 for interest accrued on the 6-percent income debentures for 1960. No part of this amount was paid on April 1, 1961; there was no available net income for that purpose.

In its 1961 Federal income tax return, the petitioner claimed a deduction of $218,386 for interest accrued on the 6-percent income debentures in 1961. This figure was 3 percent of the principal amount of the outstanding debentures—one-half of the normal interest payment. It brought the amount of accumulated unpaid interest on the debentures to the limit of 12 percent of the principal amount—such accumulation also including 3 percent for 1959 and 6 percent for 1960. No part of the interest for 1961 was paid on April 1, 1962; there was no available net income for this purpose.

In its 1962 and 1963 Federal income tax returns, the petitioner claimed no deductions for interest accrued on the 6-percent income debentures. The 12-percent limit of accumulation had been reached, and there was no available net income for the purpose of paying interest on the debentures in those years.

In its 1964 Federal income tax return, the petitioner claimed a deduction equal to 6 percent of the principal amount of the 6-percent income debentures then outstanding, as interest accrued for 1964. The petitioner's available net income for 1964 was sufficient for the payment of the 6-percent interest for 1964 and, in addition, 6-percent accumulated interest—that is, half of the 12-percent accumulated interest that had been accrued in 1959, 1960, and 1961. In 1965, the petitioner paid the 1964 interest and half of the accumulated interest out of its available net income, and in addition, it paid the remainder of the accumulated interest even though there was no available net income therefor. Thus, the entire interest arrearage on the debentures was paid in 1965, along with the 6-percent interest for 1964.

All of the arrearage of accumulated unpaid interest on the first-mortgage income bonds had been paid off in 1963; and, on the second-mortgage income bonds, in 1964. The paying off of accumulated interest on the first- and second-mortgage income bonds and the 6-percent income debentures in successive years followed an increase in the profitability of the petitioner's business operations.

In accordance with a supplemental order of the ICC dated July 1, 1966, which had been issued in response to the petitioner's application, the petitioner redeemed all of the remaining outstanding class A stock (39,861 shares). It paid for each share $25 plus accrued dividends of $3.56. The ICC said in its supplemental order that the redemption and retirement of the remaining class A stock and the issuance of a stock dividend on the class B stock would simplify the petitioner's capital structure, and enable it to broaden the market for its class B stock. By the end of 1966, all of the class A stock had been retired and canceled by the petitioner.

By the end of 1966, the principal amount still outstanding of the 6-percent income debentures was $6,805,525. Debentures in the principal amount of $114,000 had been canceled through the sinking fund, and debentures in the principal amount of $360,000 had been reacquired by the petitioner and were held by it.

That a debt security may provide for interest which is contingent upon income is generally recognized in the railroad industry and by the ICC. The Railroad Annual Report Form A, which railroads must file annually with the ICC, contains schedules for reporting "funded debt" securities providing for contingent interest, as well as interest on income bonds and other securities having contingent interest provisions. The ICC's Uniform System of Accounts for Railroad Companies discusses the proper accounting treatment to be accorded to contingent interest on funded debt. Moreover, Treasury Form 1090, a statement of income and profit and loss accounts for railroad companies, specifically provides for a charge for contingent

interest on funded debt in determining taxable net income. During the years 1954 through 1957, the ICC authorized at least eight other railroads to retire preferred stock by exchanging it for newly issued debt securities which provided for the payment of interest contingent upon the earning of income. The interest accumulation provisions on these securities ranged from being noncumulative to being cumulative to the extent of 20 percent of principal.

For purposes of convenience in the Findings of Fact, we have referred to the securities in question and to the payments made thereon according to the nomenclature used by the petitioner, without intending designations such as "debentures" and "interest" to reflect our legal conclusions.

### OPINION

The primary issue for decision is whether the 6-percent income debentures issued by the petitioner represent debt, as the petitioner contends, or whether they are actually a form of equity, as the respondent has determined. The answer will determine whether payments made to the holders of those instruments can qualify as payments of interest on an indebtedness which are deductible under section 163. If we decide that the debentures are instruments of debt, we must thereafter determine whether the petitioner is entitled to deduct those amounts designated as interest payments with respect to the period of 15 months prior to the actual issuance of the debentures—that is, "preissue interest."

The debt-equity dispute is encountered often by this and other courts. Typically, it involves an instrument which has some characteristics ordinarily associated with debt, and some ordinarily identified with equity. However, such instrument must, for tax purposes, be classified as falling on one side of the line or the other.

It is settled that no simple rule exists for determining whether an instrument should be classified as debt or equity; the ultimate test is whether in substance the arrangement more nearly resembles debt or equity, and to answer that question, all the facts and circumstances must be examined and considered. *John Kelley Co.* v. *Commissioner*, 326 U.S. 521, 530 (1946) ; *McGuire* v. *Commissioner*, 84 F. 2d 431, 432 (C.A. 7, 1936), certiorari denied 299 U.S. 591 (1936) ; *Ragland Investment Co.*, 52 T.C. 867, 875–876 (1969), on appeal (C.A. 6, Nov. 26, Dec. 1, 1969) ; *Wilbur Security Co.*, 31 T.C. 938, 948 (1959), affd. 279 F. 2d 657 (C.A. 9, 1960) ; *Clyde Bacon, Inc.*, 4 T.C. 1107, 1115 (1945). There are certain aspects of the transaction which have been commonly examined to determine how the instrument should be classified.

The name given to the instrument and the nomenclature employed

in connection with it should be considered, although they are not conclusive. *Wilbur Security Co., supra; Clyde Bacon, Inc., supra; Charles L. Huisking & Co.*, 4 T.C. 595, 599 (1945); *Northern Refrigerator Line, Inc.*, 1 T.C. 824, 828 (1943); *H. R. DeMilt Co.*, 7 B.T.A. 7, 9 (1927). It is relevant whether the parties intended, at the time of the issuance of the debentures, to create a debtor-creditor relationship. *Gooding Amusement Co.* v. *Commissioner*, 236 F. 2d 159, 166 (C.A. 6, 1956), affirming 23 T.C. 408 (1954), certiorari denied 352 U.S. 1031 (1957); *Rowan* v. *United States*, 219 F. 2d 51 (C.A. 5, 1955); *Ragland Investment Co., supra; Daytona Marine Supply Co.* v. *United States*, an unreported case (S.D. Fla. 1961, 7 A.F.T.R. 2d 1650, 61–2 U.S.T.C. par. 9523); 4A Mertens, Law of Federal Income Taxation, sec. 26.10 (1966). The intent of the parties, in turn, may be reflected by their subsequent acts; the manner in which the parties treat the instruments is relevant in determining their character. *Gregg Co. of Delaware* v. *Commissioner*, 239 F. 2d 498 (C.A. 2, 1956), affirming 23 T.C. 170 (1954), certiorari denied 353 U.S. 946 (1957); *Ragland Investment Co., supra* at 876; *Verifine Dairy Products Corporation of Sheboygan*, 3 T.C. 269, 276–277 (1944). The petitioner consistently treated the indentures as debt obligations. Nothing in the petitioner's own records, even those which long predate the issuance of the debentures, discussing the contemplated exchange and the retirement of the class A stock, indicates to the contrary. The petitioner repeatedly referred to the debentures as debt in its dealings with its own shareholders, particularly in the communications that led up to the 1958 exchange. The petitioner also treated the debentures as debt instruments in its contacts with the ICC, which recognized them as such, after examining and analyzing the transactions involved. The debentures have been so listed and traded on the New York Stock Exchange since their issuance.

The tax treatment of the transactions in question must ultimately depend on their substance. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945); *Gregory* v. *Helvering*, 293 U.S. 465 (1935); *Gilbert* v. *Commissioner*, 262 F. 2d 512 (C.A. 2, 1959), affirming a Memorandum Opinion of this Court, certiorari denied 359 U.S. 1002 (1959); *1432 Broadway Corporation*, 4 T.C. 1158 (1945), affirmed per curiam 160 F. 2d 885 (C.A. 2, 1947). Here, the exchange of the debentures for the class A stock had real significance. The petitioner was a widely held, publicly owned corporation, with about 1,200 shareholders. Its capital stock was divided into two classes, one of which, class A, held voting control over corporate affairs, and had the power to elect 8 of the 11 directors. The record does not show to what extent the same parties owned both class A and class B stock prior to the exchange,

but under the circumstances, it appears that there was no substantial identity of ownership. When the class A shareholders in large number accepted the terms of the exchange, they, as such, surrendered the voting control of the corporation. Considering that the exchange was a voluntary arm's-length transaction between parties with conflicting interests, it seems only reasonable that the participants therein felt that they were getting something in return that was of a higher order than the equity securities they were surrendering.

Similarly, in this case, the debentures and the class B stock were not owned in identical proportion after the exchange. Although the former class A shareholders received debentures and class B stock in proportion to their prior interests, the overall postexchange ownership of debentures and class B stock was not proportional in view of the other class B stock that had previously been outstanding. Compare *Universal Castings Corporation* v. *Commissioner*, 303 F. 2d 620 (C.A. 7, 1962), affirming 37 T.C. 107 (1961) ; *Gilbert* v. *Commissioner*, *supra; Gregg Co. of Delaware* v. *Commissioner*, *supra*, and *1432 Broadway Corporation*, *supra*, in which the proportional holding of debt and equity was an indication that the purported debt was really just another form of equity.

The term "interest" means the same thing for tax purposes as it does in ordinary business usage: an amount paid for the use of borrowed money. *Deputy* v. *DuPont*, 308 U.S. 488, 497–498 (1940) ; *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552, 560 (1932) ; *Campbell* v. *Carter Foundation Production Co.*, 322 F. 2d 827, 831 (C.A. 5, 1963) ; *Cleveland Adolph Mayer Realty Corporation*, 6 T.C. 730, 742 (1946), reversed on other grounds 160 F. 2d 1012 (C.A. 6, 1947). However, for debentures to be recognized as debt instruments, it is not necessary that new funds be received by the corporation in exchange for them. *Commissioner* v. *H. P. Hood & Sons*, 141 F. 2d 467 (C.A. 1, 1944) ; *Sabine Royalty Corporation*, 17 T.C. 1071, 1077 (1951) ; *New England Lime Co.*, 13 T.C. 799 (1949) ; *Toledo Blade Co.*, 11 T.C. 1079, 1084–1085 (1948), affirmed per curiam 180 F. 2d 357 (C.A. 6, 1950), certiorari denied 340 U.S. 811 (1950) ; *Cleveland Adolph Mayer Realty Corporation*, *supra* at 741. It is recognized that a corporation may assume a debt obligation to its former shareholders by virtue of the latter turning in shares of stock to the corporation in return for a promise to pay money in the future. In the present case, the debt arose when the petitioner received valuable property in the form of the class A stock. Furthermore, in the case of the shareholders who exchanged their stock for these debentures, their relationship with the petitioner *originated* as an ordinary creditor-debtor relationship. Indeed, the class A stock was distributed to those who

were senior creditors of the petitioner prior to the bankruptcy and reorganization. The owners of the present 6-percent income debentures have thus come full circle in their dealings with the petitioner. See *New England Lime Co., supra*, which also involved an exchange of preferred stock for debentures in a situation where the preferred stock had been received initially in exchange for debts owed by the corporation to the recipients prior to a corporate reorganization.

The terms of the debenture instruments themselves show a closer relationship to debt than to equity. They contain a definite maturity date on which the principal falls due for payment, without reservation or condition, which is a fundamental characteristic of a debt. *Gooding Amusement Co.* v. *Commissioner, supra; Commissioner* v. *H. P. Hood & Sons, supra; Brown-Rogers-Dixson Co.* v. *Commissioner*, 122 F. 2d 347, 350 (C.A. 4, 1941); *United States* v. *South Georgia Ry. Co.*, 107 F. 2d 3, 5 (C.A. 5, 1939); *Commissioner* v. *O.P.P. Holding Corp.*, 76 F. 2d 11, 12 (C.A. 2, 1935), affirming 30 B.T.A. 337 (1934). Although 50 years might under some circumstances be considered as a long time for the principal of a debt to be outstanding, we must take into consideration the substantial nature of the petitioner's business, and the fact that it had been in corporate existence since 1897, or 61 years prior to the issuance of the debentures. Therefore, we think that a 50-year term in the present case is not unreasonable. Compare *Swoby Corporation*, 9 T.C. 887 (1947), in which a 99-year so-called debt obligation was issued by a corporation whose principal asset was a building which had an anticipated life of less than one-third of that time.

A provision for the redemption or retirement of the bonds prior to maturity is a basic characteristic of debt rather than equity. *Commissioner* v. *Proctor Shop*, 82 F. 2d 792 (C.A. 9, 1936), affirming 30 B.T.A. 721 (1934); *Fellinger* v. *United States*, 238 F. Supp. 67 (N.D. Ohio 1964), affd. 363 F. 2d 826 (C.A. 6, 1966); *Daytona Marine Supply Co.* v. *United States, supra*. The relationship of creditor to debtor is a temporary one, ending when the debt is paid. By creating the sinking fund, provision was made for redemption of some or all of the debentures prior to maturity. In fact, debentures in the principal amount of $114,000 had been canceled by use of the sinking fund as of the end of 1966; debentures of face value of $360,000 had been reacquired by the petitioner and were held by it.

Ordinarily, a creditor, as such, is not entitled to vote in the affairs of the debtor corporation or to participate in its management. The fact that an instrument does not confer upon the holder a voting right or any power of management suggests that the instrument is debt. *Wilbur Security Co., supra; Cleveland Adolph Mayer Realty Corporation, supra* at 737; *Clyde Bacon, Inc., supra* at 1116; *Charles L.*

*Huisking & Co.*, *supra* at 599; *Daytona Marine Supply Co.* v. *United States*, *supra*. In this case, the debentures holders as such were not entitled to vote in the affairs of corporate management or the election of corporate directors. In fact, the loss of voting power was a major consideration surrendered by the participants in the exchange, in return for the higher rights of a creditor. There is nothing inconsistent about the fact that the debenture holders may also have been stockholders with voting rights as such. *Campbell* v. *Carter Foundation Production Co.*, *supra; Rowan* v. *United States*, *supra;* 4A Mertens, Law of Federal Income Taxation, sec. 26.06 (1966).

If the holders of the instruments have rights that take precedence over those of shareholders, and if there is substantial equity in the corporation, these circumstances suggest that the instruments are in fact debt. The debentures holders may be recognized as creditors even though their claims are subordinated to those of general business creditors. *John Kelley Co.* v. *Commissioner*, *supra; Commissioner* v. *O.P.P. Holding Corp.*, *supra; Fellinger* v. *United States*, *supra; H. R. DeMilt Co.*, *supra;* Rev. Rul. 68–54, 1968–1 C.B. 69. Although no language in the debenture indenture or elsewhere specifically subordinates the debenture holders to the petitioner's general creditors, it does seem that they would be subordinated as to the payment of interest, because the petitioner's ordinary business expenses would be deducted before arriving at the figure for available net income. However, it is clear that net income is allocated to interest payments on the debentures, and to payments to the sinking fund associated with the debentures, before such income is available for the payment of dividends to shareholders. In addition, in the event of the petitioner's default, either the holders of 25 percent of the debentures or the trustee under the indenture could declare the principal amount of all the outstanding debentures to be due and payable immediately. Furthermore, the fact that the petitioner's debt-equity ratio at the close of 1958 was 1.08 to 1, counting the debentures as debt, indicates that the debenture holders' position as creditors was not based on shaky ground, despite the subordination to the holders of the preexisting first- and second-mortgage income bonds. There was no "thin capitalization" here.

Traditionally, interest on an indebtedness is payable without regard to whether there are corporate profits or surplus. *Ragland Investment Co.*, *supra*. However, there are many cases in which the courts have found obligations to be debt even though the interest was payable only out of income, when the obligations otherwise resembled debt. *John Kelley Co.* v. *Commissioner*, *supra; Commissioner* v. *H. P. Hood & Sons*, *supra; H. R. DeMilt Co.*, *supra* at 11. Although the interest is payable out of the petitioner's available net income, and is thus liable to fluctuate according to the vicissitudes of the petitioner's business

fortunes, the amount of interest required to be paid in any year may be ascertained according to an established formula, and such formula for payment leaves nothing to the discretion of the corporate directors. The fact that the directors have the discretion to make payments to the debenture holders in addition to the interest which is required to be paid under the formula does not affect the character of the obligation. The basic provision for payment of interest was automatic rather than dependent upon the directors. That the amount of interest paid out depends upon profits and is not always the same fixed percentage of principal does not transform the debentures into equity certificates under these circumstances. See *Dorzback* v. *Collison*, 195 F. 2d 69 (C.A. 3, 1952).

The respondent even agrees that the debentures are not required to be treated as equity merely because the interest is payable only out of income. However, he does contend that the exchange of the debentures for the class A stock did not effect any significant change in the relationship between the petitioner and the holders of the stock. He suggests that the only significant reason for the exchange was to secure a tax benefit—a deduction for the interest. He points out that the accumulated interest was not paid until 1965 and argues that it was paid then only because he had questioned the classification of the debentures as debt. In response, the petitioner argues that the exchange was arranged to eliminate the class A stock and thereby to simplify its capitalization; it says that such simplification was necessary or advisable in order to facilitate a combination with another railroad.

The issuance of debt obligations in which interest is payable only out of income is a common practice in the railroad industry. The first- and second-mortgage bonds provided for interest payable only out of available income, and so far as we are aware, their classification as debt has not been challenged. Thus, the mere fact that the interest on the debentures was payable only out of income is not surprising and does not cast a cloud over the petitioner's motive under these circumstances. Furthermore, the record does support its position as to the purpose for the exchange. Ever since the bankruptcy reorganization, it has apparently been the objective of the officials in charge of the petitioner to bring about a combination with another railroad, and to accomplish that objective, it has always been recognized that a simplification of the petitioner's capital structure would be helpful. Initially, it was thought that the class A stock could be eliminated by repurchase, but when the funds were insufficient for that purpose, then other means had to be found. Since the offer of the exchange of the debentures for the class A stock was voluntary, it did not immediately bring about an elimination of the class A stock; but it did eventually reduce the amount of class A stock to a level when it could be repurchased. Al-

though the officials in charge of the corporate affairs of the petitioner were always aware of the tax benefit that would result from the issuance of the debentures, it was not their sole objective; and on the basis of the entire record. We have found that the exchange of the debentures for the class A stock did significantly alter the relationship between the petitioner and its shareholders.

Nor do we agree with the respondent in the inference which he draws from the payment of the accumulated interest in 1965. The satisfaction of the accumulated interest on the debentures followed closely after the petitioner's payment of the accumulated interest on the first- and second- mortgage income bonds. Furthermore, all of these payments of accumulated interest occurred when the petitioner's business operations became profitable.

In the light of all these circumstances, it seems clear to us that the income debentures are in substance debt, and we do find and hold. The petitioner was amply capitalized, and its stock was widely held; the debentures were consistently treated as debt by all parties to the transaction; they had a fixed maturity date, but there was provision for their earlier redemption; the exchange of the debentures for class A stock significantly altered the relationship between the petitioner and the participants; the exchange was arranged for a bona fide business purpose; and although the payment of interest was restricted to income, the holders of the debentures had a right to receive the interest which was different than the right of a shareholder.

Having so concluded, we reach the question of whether the petitioner may deduct, as interest on an indebtedness, the so-called interest which was paid with respect to the 15-month period prior to the issuance of the debentures. The petitioner has claimed such preissue interest as a deduction in 1958; whereas, the respondent contends that it is either wholly nondeductible, or else should be amortized over the life of the debentures.

We agree with the petitioner and hold that, under the facts of this case, the preissue interest is deductible in 1958. *Commissioner* v. *Philadelphia Transportation Co.*, 338 U.S. 883 (1949), affirming per curiam 174 F. 2d 255 (C.A. 3, 1949), affirming 9 T.C. 1018 (1947); *Commissioner* v. *Pressed Steel Car Co., Inc.*, 152 F. 2d 280 (C.A. 3, 1945), affirming per curiam a Memorandum Opinion of this Court, certiorari denied 328 U.S. 838 (1946); *Commissioner* v. *Columbia River Paper Mills*, 126 F. 2d 1009 (C.A. 9, 1942), affirming 43 B.T.A. 104 (1940); *Ernst Kern Co.*, 1 T.C. 249 (1942); *Oregon Pulp & Paper Co.*, 47 B.T.A. 772 (1942). As was observed by the Third Circuit in *Philadelphia Transportation Co.*, 174 F. 2d at 256, the situation we have here is the same as if the petitioner had provided for the payment of a higher rate of interest for the first 9 months of the debentures. The fact

that the interest was denominated as attributable to a period prior to the issuance of the obligations was held to be immaterial in that case.

The respondent's efforts to distinguish *Philadelphia Transportation Co.* and *Columbia River Paper Mills* from the case at hand are unconvincing. The respondent points out that *Philadelphia Transportation Co.* involved debentures issued pursuant to a reorganization under section 77 of the Bankruptcy Act, whereas Monon's debentures were not issued pursuant to such a reorganization. However, we see no language in the *Philadelphia Transportation Co.* opinions, nor does the respondent direct us to any such language, which would indicate that the holding of that case was to be limited to that narrow factual situation. The factual difference, in our opinion, has no legal significance.

In both *Philadelphia Transportation Co.* and *Columbia River Paper Mills*, the circuit courts noted that there was no suggestion that the taxpayer acted for the purpose of tax avoidance in structuring the transactions in issue. In the present case, the respondent did, of course, make such a suggestion; but we do not think that this can justify reaching the opposite result with respect to the deductibility of the preissue interest. We have found that the exchange transaction in this case had some non-tax-related purposes; furthermore, it is settled that a taxpayer may use any device within the framework of the law to minimize the incidence of taxes. *Commissioner* v. *Tower*, 327 U.S. 280, 288–289 (1946); *Gregory* v. *Helvering*, 293 U.S. 465 (1935); *Cooper Agency*, 33 T.C. 709, 715 (1960), affirmed per curiam 291 F. 2d 831 (C.A. 4, 1961); *Julius H. (Groucho) Marx*, 29 T.C. 88, 100 (1957). There is no reason to require that a taxpayer be oblivious to the tax consequences of his acts in order to be allowed a deduction as a result of those acts.

In support of his position, the respondent cites *Commissioner* v. *Drovers Journal Pub. Co.*, 135 F. 2d 276 (C.A. 7, 1943), reversing a Memorandum Opinion of this Court. However, we think that decision's weight as authority has been vitiated by the Supreme Court's subsequent per curiam affirmance of the Third Circuit's opinion in *Commissioner* v. *Philadelphia Transportation Co.*, 338 U.S. 883 (1946), which expressly reached a result contrary to that in *Drovers Journal Pub. Co.* See 174 F. 2d at 257, fn. 5.

The respondent makes the alternative argument that, if the preissue interest is deductible, then it should be amortized over the life of the debentures. In support of this theory, the respondent relies on *Helvering* v. *Union Pac. R. Co.*, 293 U.S. 282 (1934), and *Colorado & Southern Railway Co.*, 36 B.T.A. 1248 (1937), reversed on other grounds 102 F. 2d 345 (C.A. 10, 1939). Both of these cases involved the manner of deducting discounts on bonds and commissions on the sales of bonds, where the bonds were sold prior to March 1, 1913, and

the expenses were incurred prior to that date. Neither case involved interest. It is amply clear that the cases relied upon by the respondent are easily distinguishable from the one at bar, and that such cases provide no basis for holding inapplicable the rule of *Commissioner* v. *Philadelphia Transportation Co., supra.*

To reflect the concessions of the parties on other issues,

*Decision will be entered under Rule 50.*

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended.